

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OKLAHOMA FIREFIGHTERS PENSION & RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, | Civil Action No. **12 CIV 0895**<br><br>CLASS ACTION |
| Plaintiffs, | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| STUDENT LOAN CORPORATION, MICHAEL J. REARDON, JOSEPH P. GUAGE, SCOT H. PARNELL, PATRICIA A. MORRIS, CITIGROUP INC., CITIBANK N.A., CITI HOLDINGS, INC., DISCOVER FINANCIAL SERVICES, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |



**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer
Daniel L. Berger
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501

**GARDY & NOTIS, LLP**
Mark C. Gardy
Meagan Farmer
501 Fifth Avenue, Suite 1408
New York, New York 10017
Tel: 212-905-0509
Fax: 212-905-0508

*Attorneys for Plaintiff Oklahoma Firefighters Pension & Retirement System*

## TABLE OF CONTENTS

**Page(s)**

I.      INTRODUCTION ................................................................. 1

II.     JURISDICTION AND VENUE ..................................... 4

III.    PARTIES ........................................................................ 4

IV.     FRAUDULENT SCHEME AND COURSE OF BUSINESS ............................................. 7

V.      BACKGROUND ........................................................... 7

VI.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
        MATERIAL OMISSIONS .......................................... 11

VII.    STU'S FALSE FINANCIAL REPORTING DURING THE
        CLASS PERIOD ........................................................ 34

VIII.   DEFENDANTS' SCIENTER ..................................... 39

IX.     LOSS CAUSATION/ECONOMIC LOSS ................... 41

X.      CLASS ACTION ALLEGATIONS ........................... 42

        COUNT ONE
        For Violation of § 10(b) of the 1934 Act and Rule 10b-5 Against
        All Defendants (except the Citi Defendants) ............... 43

        COUNT TWO
        For Violation of §20(a) of the 1934 Act Against the Individual
        Defendants ................................................................ 44

        COUNT THREE
        For Violation of §20(a) of the 1934 Act Against Citi Defendants ................... 44

XI.     PRAYER FOR RELIEF ............................................ 45

XII.    JURY DEMAND ....................................................... 45

## I.     INTRODUCTION

1.      This is a securities class action brought by Oklahoma Firefighters Pension & Retirement System ("Oklahoma Firefighters" or "Plaintiff"), individually and on behalf of all persons who purchased or otherwise acquired the common stock of The Student Loan Corporation ("STU" or the "Company") between January 15, 2008 and September 23, 2010, inclusive (the "Class Period"), against STU and certain of its officers and/or directors, Citigroup, Inc., Citibank, N.A., Citi Holdings, Inc., and Discover Financial Services (collectively "defendants") for violations of Sections 10(b) and 20(a) the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

2.      At all relevant times, STU was one of the nation's leading originators and holders of student loans, providing a range of education financing products for students attending both traditional schools and non-traditional schools.  Traditional schools are typically institutions of higher education that are not-for-profit and offer bachelors and graduate degrees.  Non-traditional schools are typically educational institutions that are for-profit and offer associate degrees and/or vocational, career or technical programs.

3.      While the majority of STU's student loans were originated under the Federal Family Education Loan (FFEL) program – and thus authorized and guaranteed by the Department of Education under the Higher Education Act of 1965, as amended – STU also offered its own, private educational loan products, called CitiAssist® loans, which the Company itself underwrote and serviced.  Unlike FFEL loans, CitiAssist loans were not insured by the government.  During the Class Period, however, some portion of STU's CitiAssist loan portfolio was partially insured against loss through private insurance purchased by STU itself, or by risk-sharing agreements with educational institutions.  Other portions of STU's CitiAssist loan portfolio were uninsured, including many of STU's higher risk loans.  Beginning in January 2008, STU elected to stop insuring all new CitiAssist

loan originations, and so for all CitiAssist loan originations throughout the Class Period, STU was exposed to 100% of the potential losses.

4.      As the economy rapidly deteriorated in 2008, STU began to experience a high level of defaults on its various student loan portfolios.  These defaults continued to grow during the Class Period with the economy entering a recession and with unemployment rates soaring. Instead of informing the investing public about its mounting losses resulting from bad loans, taking appropriate impairment charges, and implementing sufficient loan loss provisions to account for STU's probable losses, STU failed to inform investors about the rapid deterioration of its business, and similarly failed to take adequate impairment charges and set adequate loan loss provisions and reserves.

5.      At the same time STU was failing to properly account for its mounting risks and losses, defendants issued materially false and misleading statements regarding the Company's business and financial results, by telling the investing public that it was well positioned and performing well despite adverse market conditions.  As a result of defendants' false statements, STU's stock traded at artificially inflated prices during the Class Period, reaching its Class Period high of over $135 per share.

6.      The truth was not fully revealed to the market until the Company announced in an SEC filing on September 23, 2010, that it was taking a "pre-tax impairment" charge of over $900 million,  because the fair market value of certain assets was far less then the Company's carrying value of those same assets.  This announcement came just days after STU announced the sale of these same assets, and the Company itself, to a group of buyers for $30 per share (the "STU Transactions").

7.      As the result of the STU Transactions, STU was acquired by Discover Financial Services ("Discover"), effective on December 31, 2010, and became a wholly owned subsidiary. STU securities were suspended from trading on January 3, 2011 and were delisted from the NYSE on January 14, 2011.

8.      The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

    a.      The Company failed to engage in proper due diligence and underwriting when originating student loans, in particular the Company's CitiAssist loans;

    b.      The Company was not setting adequate loan loss provisions for uncollectible loans in violation of Generally Accepted Accounting Principals ("GAAP"), causing its financial results to be materially misstated;

    c.      The Company was not taking adequate impairment charges to write down the carrying value of its assets to reflect their true fair market value;

    d.      The Company failed to disclose known trends and uncertainties as required by SEC regulations concerning uncollectible or bad loans within its loan portfolio; and

    e.      The Company had far greater exposure to anticipated losses and defaults than it had previously disclosed.

9.      As a result of defendants' false statements and material omissions, STU's stock price traded at inflated levels during the Class Period.  However, after the revelation of additional loan loss provisions seeped into the market through a series of partial, corrective disclosures, culminating with the disclosure of a massive impairment charge of almost $1 billion on September 23, 2010, the Company's shares suffered a significant sell-off, closing on September 23, 2010 at $29.76 from their Class Period high of over $135 per share.

3

## II.     JURISDICTION AND VENUE

10.     The claims asserted arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5. Jurisdiction is conferred by §27 of the 1934 Act.  Venue is proper pursuant to §27 of the 1934 Act. STU has operations in this District, false statements were made in this District and acts giving rise to the violations complained of occurred in this District.   In addition, Defendants Citigroup, Citibank, and Citi Holdings are headquartered in this District.

## III.    PARTIES

11.     Plaintiff  Oklahoma Firefighters purchased STU common stock as described in the attached certification and was damaged thereby.

12.     Defendant STU was one of the nation's leading originators and holders of student loans providing a full range of education financing products and services.  The Company was incorporated in 1992 under the laws of the State of Delaware, and it was headquartered in Stamford, Connecticut.  Prior to its sale to Discover, STU was a subsidiary of Citibank, N.A ("CBNA"), and then Citi Holdings, entity which previously held 80% of STU's common stock. Prior to the STU Transactions, the Company's stock traded under the symbol STU on the New York Stock Exchange.

13.     Defendant Michael J. Reardon ("Reardon") served as Chief Executive Officer ("CEO") of the Company from July 2004 until December 31, 2010, and served as the Chairman of the Board of Directors from January 2006 until December 31, 2010.  He was the President of STU from February 2005 until December 31, 2010.

14.     Defendant Scot H. Parnell ("Parnell") was the Chief Financial Officer ("CFO") of STU from February 29, 2008 through February 12, 2010.

15.     Defendant Joseph P. Guage ("Guage") joined the Company in 2006 as Assistant Controller.  Guage assumed the role of Controller and Chief Accounting Officer effective August

4

7, 2007.  On January 28, 2010, STU appointed Guage to the position of interim CFO, effective February 12, 2010, and to the position of CFO, effective March 8, 2010.

16.    Defendant Patricia A. Morris ("Morris") served as Chief Risk Officer of STU from May 15, 2007 to December 31, 2010 and served as its Vice President until December 31, 2010.  Morris served as Director of Risk Department at STU since September 2005.  Prior to joining STU, Morris spent 13 years at Sallie Mae, Inc. and served as Vice President with responsibility, among other things, for credit and loan loss reserve policy.

17.    Defendants Reardon, Guage, Parnell, and Morris, (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of STU's annual and quarterly reports, press releases, and other market communications.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.

18.    Defendant Citigroup Inc. ("Citigroup") is a Delaware corporation with its principal executive offices in New York, New York.  Citigroup is a diversified financial services holding company whose subsidiaries provide a broad range of financial products and services, including consumer banking and credit, corporate and investment banking, securities brokerage, transaction services, and wealth management.  Citigroup's common stock is traded on the New York Stock Exchange (the "NYSE") under the symbol "C."

19.     Defendant Citibank N.A. ("CBNA") is a wholly-owned subsidiary of Citigroup, with its principal executive offices in New York, New York.  Citibank offers banking, lending, financial, and investment products and services.  Citibank is Citigroup's primary depository institution.  Prior to January 2009, Citibank owned 80% of STU common stock, and operated STU as a "controlled company" within the meaning of SEC rules and regulations.

20.     Defendant Citi Holdings, Inc. ("Citi Holdings") is a wholly-owned subsidiary of Citigroup, with its principal executive offices in New York, New York.  Citi Holdings was created in January 2009 to house, among other things, Citigroup's "toxic" assets that Citigroup was attempting to divest in the wake of the federal bailout, including various consumer lending businesses, like STU.  Citi Holdings was the entity that sold certain of STU's assets to Sallie Mae and Citibank, with the remainder of STU's business being acquired by Discover, in the last quarter of 2010, as part of the STU Transactions.

21.     Collectively Citigroup, CBNA, and Citi Holdings are referred to herein as the Citi Defendants.  Prior to the STU Transactions, the Citi Defendants were the 80% direct and indirect controlling stockholders of STU.  Half of the Board of Directors of STU – four of eight – were employees of the Citi Defendants.   Specifically, Vikram A. Atal, Gina Doynow, Richard Garside, and Laurie A. Hesslein were all officers of Citigroup.  Also, James L. Bailey previously held various management positions at CBNA from 1972 to 2000, when he retired as Executive Vice President and Group Executive.  Because of its controlling 80% interest in STU, the Citi Defendants possessed the power and authority to control the contents of STU's annual and quarterly reports, press releases, and other market communications.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause

them to be corrected.  Because of their position as controlling shareholders of the Company, and their access to material non-public information available to them but not to the public, the Citi Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.

22.     Defendant Discover Financial Services ("Discover") is named herein as successor-in-interest to STU liabilities by virtue of the STU Transactions.

**IV.     FRAUDULENT SCHEME AND COURSE OF BUSINESS**

23.     Defendants are liable for: (i) making false statements; and/or (ii) failing to disclose adverse facts known to them about STU; and or (iii) engaging in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of STU common stock.  Defendants: (i) deceived the investing public regarding STU's prospects and business; (ii) artificially inflated the price of STU common stock; and (iii) caused plaintiff and other members of the Class to purchase STU common stock at inflated prices.

**V.     BACKGROUND**

24.     STU together with its subsidiaries, provided various education financing products and services to students, parents, schools, and lenders in the United States.  It originated, managed, and serviced student loans, the majority of which arose under the Federal Family Education Loan program ("FFEL"), authorized by the U.S. Department of Education under the Higher Education Act.  For these FFEL loans, the Company offered Subsidized Federal Stafford loans to students who pass certain need criteria; Unsubsidized Federal Stafford loans to students who do not qualify for Subsidized Federal Stafford loans due to parental and/or student income and assets in excess of permitted amounts; and Federal PLUS loans that are made to parents of dependent students and to graduate and professional students.  Its portfolio also included loans

made under the Federal Supplemental loans for students and Health Education Assistance Loans
programs.

25.     The Company, through a trust agreement with CBNA, was also a leading
originator, manager and servicer of private education loans.  The private education loans arose
under STU's CitiAssist program, a private education loan program for students who do not
qualify for government student loan programs or seek additional educational financing beyond
that available through government programs and other sources.  In anticipation of new federal
laws aimed at increasing the government's involvement (and correspondingly decreasing the
private sector's involvement) in originating and serving loans under the FFEL program, STU
dramatically shifted its business to increase its focus on CitiAssist loans beginning in 2007.  At
the beginning of 2008, it dramatically increased its exposure to losses on its CitiAssist loans, by
reaching a corporate decision to stop insuring such loans against the risk of loss.

26.     The earnings of the Company were primarily generated by the spread between the
interest earned on its loan assets, (based on the 90-day Commercial Paper rate as published by
the Department (CP), the prime rate, or the 91-day Treasury Bill rate) and the interest paid on its
borrowings (based on London Interbank Offered Rate (LIBOR), CP or the prime rate).  Gains on
sales of loans to the U.S. Department of Education through its Loan Purchase Commitment
Program, whole loan sales and off-balance sheet securitizations contributed significantly to the
Company's earnings.

27.     STU chose a particularly risky time to increase its exposure to CitiAssist loans,
and in particular uninsured CitiAssist loans.  Before these decisions, as STU knew, lenient
underwriting involving the extension of loans to subprime borrowers at non-traditional schools
had skyrocketed, and lenders like STU were freely offering new types of especially risky loans

that, among other things, did not require appropriate documentation.  By the time that STU began ramping up its exposure to CitiAssist loans, the economy and job market had already begun to tumble and student loan delinquency rates -- a result of risky loan practices -- had been steadily increasing for more than a year.

28.     Aware that investors were specifically concerned about risks associated with CitiAssist loans, and in particular uninsured CitiAssist loans where STU was exposed to 100% of the risk of loss, during the Class Period STU repeatedly assured investors that its loan portfolios were performing well by not charging proper loan loss provisions and by overvaluing its loan assets (and failing to take impairment charges related to the same) in its public filings with the SEC.  STU regularly disclosed modest amounts of loan loss reserves compared to its peers in order to demonstrate that STU was not overly exposed to large risks of default.  For example, in its report of quarterly earnings for the period ending June 30, 2010 (2Q 2010 Form 10-Q), STU actually reported that its "provision for loan losses decreased by $3.4 million … as compared to the same period in 2009" primarily "driven by stabilizing performance" in, among other things, its uninsured CitiAssist Custom portfolio.  In so doing, STU misled investors to believe that its risks were decreasing.

29.     During the Class Period, defendants should have known of the deterioration of its loan portfolios and the severe risk that these portfolios posed in the prevailing economic climate, but STU assured investors that its exposure to defaults was minimal, and that its portfolio was exposed to almost no losses because of the quality of its underwriting and conservative business practices.

30.     Investors are very attentive to the size of the loan loss provisions, because they are an indicator of the stability and riskiness of the loan portfolios, and of the loan provider's

ability to absorb losses without having to take additional future charges and impairments. Thus, by taking modest provisions, and by failing to write down the value of assets impaired by bad loans, STU signaled to investors that its risks were in check and its loan portfolios performing well.

31.     This changed very rapidly in September 2010, when STU was forced to come clean because of an open market sale of its loan assets. On September 17, 2010, STU issued a press release announcing that it had entered into a definitive agreement with Discover Financial Services ("Discover") for Discover to acquire STU, and thereby become the owner of its private student loan business as well as $4 billion of its private student loans. Separately and immediately prior to the transaction: (i) Sallie Mae would acquire from STU $28 billion of securitized federal student loans and related assets and (ii) CBNA would acquire from STU certain federal and private student loans and other assets totaling $8.7 billion (together, the "STU Transactions"). Upon the closing of the STU Transactions, shareholders of STU were to receive $30 per share.

32.     Less than a week later, on September 23, 2010, in connection with reporting of third quarter 2010 results and further details about the STU Transactions, STU's prior statements about the fair value of its assets and its low reserves were exposed as untrue, and merely the result of improper accounting. By acknowledging that its carrying value of loan assets was overvalued by more than $900 million dollars, STU was finally forced to admit that it overvalued its loan portfolios and failed to timely record appropriate "provisions" -- i.e., liabilities for probable losses -- throughout the Class Period. STU's failure to appropriately account for its bad loan exposures caused STU to artificially inflate its reported assets and understate its exposure to risk.

33.     Under Generally Accepted Accounting Principles ("GAAP"), STU was required to record provisions for loan losses, which represent an estimate of the ultimate costs to STU of eventual loan defaults.  The size of the provisions is based on the riskiness of the STU's portfolio -- all other things being equal, if the loan provider holds only low-risk loans, its reserves will be relatively low; if, on the other hand, the loan provider holds very high-risk loans, it will charge larger provisions to account for the increased likelihood that it will be unable to collect from defaulting borrowers.  The size of the provision reduces the value of the loan providers' assets.  Accordingly, any increase in the loan loss provision will invariably result in a corresponding decrease in the value of STU's loan portfolios.  Thus, accurate assessments of the riskiness of the loan portfolio are essential and must be performed regularly.

34.     The STU Transactions were consummated on December 31, 2010.  STU securities were delisted from the NYSE on January 14, 2011.  As a result of shareholder litigation involving the terms and price of the STU Transaction, STU's public shareholders ultimately received $32.50 per share.

## VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS

35.     While its competitors were revealing to the market that they would face significant losses, STU continued to tell its investors that it was doing well in an effort to keep its stock prices and financial reports artificially inflated.

36.     For example, on January 15, 2008, the start of the Class Period, the Company issued a press release reporting mixed financial results for 4Q and year ending December 31, 2007.  Despite the mixed results, Defendant Reardon assured investors that STU was in a good position: "We are pleased with our results in light of the difficult market conditions.  We have consistently grown our managed assets and believe we have the balance

sheet strength to continue this growth and to gain market share in the current market environment."

37.     The press release also positively announced that:

> During the twelve-month period ended December 31, 2007, the Company's managed student loan portfolio *grew* by $2.8 billion (8%) to $36.5 billion reflecting the Company's continued *strong origination performance*. The managed portfolio includes $22.0 billion of Company owned loan assets and $14.5 billion of loans serviced on behalf of securitization trusts or other lenders. Originations for the year included retail FFELP Stafford and PLUS originations of $4.6 billion, *a 22% increase from 2006*. The Company also made new CitiAssist Loan commitments of $1.8 billion, down 1% compared to last year, due largely to the shift in volume to the Graduate PLUS loan product which was introduced last year. Loan consolidation and other secondary market activities contributed approximately $2.4 billion of loans to the Company's student loan portfolio during 2007. For the fourth quarter, FFELP originations of $851 million *increased 24%* over the fourth quarter of 2006, and overall retail originations were $1.1 billion which represents a *10% increase* over the fourth quarter of 2006.

(Emphasis added).

38.     STU further reported a charge of only $42 million in allowances for loan losses against loan assets of $21.6 billion, $4.7 billion of which consisted of higher risk CitiAssist loans.

39.     These statements were false and misleading for the following reasons:

a.   STU's loan loss provisions were inadequate, and too low to cover for the probable defaults in STU's CitiAssist program.

b.   STU failed to take adequate impairment charges to reflect the reduced fair market value of its loan assets.

c.   STU failed to adequately disclose known trends in STU's business which dramatically increased the likelihood of further loan defaults and losses which would need to be absorbed by the Company.

40.     Because the truth was shielded from the investing public, investors acted on STU's positive representations about the Company's outlook.  Based on these representations STU's stock prices began to climb, from its close of $92.60 on January 15, 2008, to trade at over $120 a share on January 29, 2008.

41.     On April 18, 2008, the Company issued a press release, again reporting mixed financial results for the first quarter 2008 (1Q 2008).

42.     Reardon, however, again assured investors that STU was well positioned: "The student loan industry has experienced significant regulatory changes in the recent months, coupled with the continuation of a challenging credit market.  We continue our disciplined approach to managing risk, and in light of the current environment, are very pleased with our results.  We are focused on growing our most profitable origination activities and believe we are well positioned to gain market share in these areas."

43.     STU also announced that during the first quarter of 2008, it completed approximately $1.6 billion of debt financing through securitization.  Reardon told investors that this debt financing was evidence of STU's strength in the marketplace:  "Our ability to complete a transaction of this magnitude in the current environment clearly demonstrates our ability to successfully access funding even in the most trying markets."

44.     The press release also reported that:

During the twelve-month period ended March 31, 2008, the Company's managed student loan portfolio *grew by $3.7 billion (10%) to $39.1 billion*.  The managed portfolio includes $24.5 billion of Company owned loan assets and $14.6 billion of loans serviced on behalf of securitization trusts or other lenders.  Originations for the quarter included retail FFELP Stafford and PLUS originations of $1.9 billion, a *25% increase from the same quarter of 2007*.

\* \* \*

Net interest income of $81 million for the first quarter of 2008 was $12 million (13%) lower than the same quarter of 2007.  The net interest margin for the

13

quarter was 1.36%, a 29 basis point decrease from the same quarter of 2007.  This decrease was primarily driven by rapidly declining interest rates, which impacted assets more quickly than liabilities, and also included a $2 million reduction in interest income due to the enactment of the College Cost Reduction and Access Act. This decrease was partially offset by higher average loan balances.

The Company's allowance for loan losses at March 31, 2008, was $55 million compared to $21 million at March 31, 2007.  This increase includes $22 million related to the uninsured CitiAssist portfolio driven by continued seasoning of the portfolio as well as an increase in the amount of higher risk loans made to students attending proprietary schools entering repayment.

(Emphasis added).

45.     STU further reported loan assets of $24 billion, $5.5 billion of which consisted of higher risk CitiAssist loans.

46.     These statements were false and misleading for the following reasons:

a.   STU's loan loss provisions were inadequate, and too low to cover for the probable defaults in STU's CitiAssist program.

b.   STU failed to take adequate impairment charges to reflect the reduced fair market value of its loan assets.

c.   STU failed to adequately disclose known trends in STU's business which dramatically increased the likelihood of further loan defaults and losses which would need to be absorbed by the Company.

47.     Because the truth was shielded from the investing public, investors acted on STU's positive representations about the Company's outlook.  Based on these representations, STU's stock prices again began to climb, trading up to close at over $135 per share (a Class Period high) by May 2, 2008.

48.     On July 18, 2008, STU reported its financial results for the second quarter 2008 (2Q 2008), as follows:

net income of $42 million, or $2.10 per share, for the quarter ended June 30, 2008, a decrease of $29 million (40%) compared to net income of $71 million, or $3.53 per share, reported in same quarter of 2007.  This decrease was primarily driven by a $26 million (after-tax) increase in the Company's provision for loan losses, largely attributable to increased reserves associated with losses inherent in the higher risk, uninsured segment of the Company's CitiAssist private education loan portfolio.  In addition, the Company's gains on loans securitized decreased $29 million (after-tax) during the second quarter as compared to the same quarter in 2007, due to the overall degradation of market conditions.  These decreases were partially offset by an increase in fee and other income of $18 million (after-tax), reflecting a net mark-to-market gain on the Company's residual interests and associated hedges.

49.     In this same press release the Company announced that

During the twelve-month period ended June 30, 2008, the Company's managed student loan portfolio grew by $4.0 billion (11%) to $39.3 billion *reflecting the Company's continued strong origination performance*.  The managed portfolio includes $23.1 billion of Company-owned loan assets and $16.2 billion of loans serviced on behalf of securitization trusts or other lenders.  Originations for the quarter included retail FFELP Stafford and PLUS originations of $0.7 billion, a *20% increase* from the same quarter of 2007.  The Company also made new CitiAssist loan commitments of $0.2 billion, *up 1% compared* to the same quarter of last year.

* * *

Net interest income of $119 million for the second quarter of 2008 was $17 million *(16%) higher* than the same quarter of 2007. This increase was driven by higher average loan balances as well as an increase in net interest margin.  Net interest margin for the quarter was 1.89%.  This *15 basis point improvement* over the second quarter of 2007 was driven by management's repositioning of the portfolio towards higher rate loans, partially offset by a $20 million increase in funding costs due to higher credit premiums over LIBOR.  The trend towards higher credit premiums is expected to continue as the Company refinances its maturing term debt under less favorable conditions

* * *

The Company's allowance for loan losses at June 30, 2008, was $82 million compared to $42 million at December 31, 2007.  This increase of $40 million includes $38 million related to the higher risk uninsured CitiAssist portfolio. This increase is largely due to a $25 million increase in reserves associated with certain higher risk uninsured loans that have not yet entered repayment status.  Continued seasoning of the Company's CitiAssist portfolio also added to the increase.

(Emphasis added).

15

50.    STU further reported loan assets of $21 billion, $5.8 billion of which consisted of higher risk CitiAssist loans.

51.    These statements were false and misleading for the following reasons:

a.    STU's loan loss provisions were inadequate, and too low to cover for the probable defaults in STU's CitiAssist program.

b.    STU failed to take adequate impairment charges to reflect the reduced fair market value of its loan assets.

c.    STU failed to adequately disclose known trends in STU's business which dramatically increased the likelihood of further loan defaults and losses which would need to be absorbed by the Company.

52.    Because the truth was shielded from the investing public, investors acted on STU's positive representations about the Company's outlook.  Based on these representations, STU's stock price climbed from a close of $110.76 per share on July 18, 2008, to close at over $119 per share just days later on July 23, 2008.

53.    On October 16, 2008, STU reported its third quarter (3Q 2008) financial results as follows:

net income of $4.4 million, or $0.22 per share, for the quarter ended September 30, 2008, a decrease of $20.6 million (82%) compared to net income of $25.0 million, or $1.25 per share, reported in same quarter of 2007.  The overall deterioration in the financial markets adversely affected the Company's results of operations.  These disruptions resulted in the Company recording a $19.2 million (after-tax) write down on loans held for sale that were transferred back into the Company's portfolio during the quarter.  In addition, due to the lack of liquidity in the whole loan market, the Company's loan selling activities have significantly decreased, resulting in a $9.6 million (after-tax) decrease in associated gains from the same quarter in 2007.  An increase of $15.9 million (after-tax) in the Company's provision for loan losses also contributed to the year-over-year decline. These items were partially offset by a net increase in mark-to-market gains of $34.5 million (after-tax) on the Company's retained interests and associated hedges over the same quarter in 2007.

16

54.     While acknowledging the student loan industry was in "turmoil" by this point, Reardon told investors that STU was different than its competitors and was still strong: "The unprecedented turmoil in the financial markets is severely affecting the entire student lending industry.   As we continue to reposition our products and re-engineer our processes, we are determined to emerge from the current market disorder as a stronger and more nimble organization with adequate liquidity to fund operations for the foreseeable future.  Despite the financial crisis, we continue to demonstrate our resolve to provide unparalleled solutions that allow students and their families to finance the education of their choice while simultaneously providing value to our shareholders."

55.     STU also announced in this same release that:

During the twelve-month period ended September 30, 2008, the Company's managed student loan portfolio grew by $4.4 billion (12%) to $41.4 billion reflecting the Company's continued strong origination performance.  The managed portfolio includes $24.9 billion of Company-owned loan assets and $16.5 billion of loans serviced on behalf of securitization trusts or other lenders. Originations for the quarter included retail FFELP Stafford and PLUS originations of $2.1 billion, a *29% increase* from the same quarter of 2007.  The Company also made new CitiAssist loan commitments of $0.6 billion, *up 6%* compared to the same quarter of 2007.

\* \* \*

The Company's other income of $17.1 million for the third quarter of 2008 was $11.4 million higher than the same quarter of 2007.  This increase was mainly attributable to an improvement in the net gains and losses on the Company's derivatives and retained interests from securitization of $55.9 million over the same quarter in 2007.  This increase was largely due to lower expected borrower benefit utilization within the Company's securitization trusts.  This increase was partially offset by a $31.0 million valuation allowance on loans held for sale, which were transferred back into the Company's portfolio during the third quarter of 2008 as well as a decrease in gains on whole loan sales of $15.6 million from the same quarter in 2007.

\* \* \*

The Company's allowance for loan losses at September 30, 2008 was $110.7 million compared to $42.1 million at December 31, 2007.  This increase of $68.5

17

million includes $64.8 million related to uninsured CitiAssist loans. At September 30, 2008, the uninsured CitiAssist loan portfolio represented 5% of the Company's student loan assets. During 2008, the Company made changes to significantly reduce the origination levels of the riskier segments of this portfolio.

(Emphasis added).

1. STU further reported loan assets of $24.9 billion, $5.8 billion of which consisted of higher risk CitiAssist loans.

56.     These statements were false and misleading for the following reasons:

a.  STU's loan loss provisions were inadequate, and too low to cover for the probable defaults in STU's CitiAssist program.

b.  STU failed to take adequate impairment charges to reflect the reduced fair market value of its loan assets.

c.  STU failed to adequately disclose known trends in STU's business which dramatically increased the likelihood of further loan defaults and losses which would need to be absorbed by the Company.

57.     Based on the false assurances given by defendant Reardon in the October 16, 2008 press release, STU shares rose from a closing price of $51.00 on October 15, 2008 to a closing price of $54.00 per share on October 16, 2008.

58.     In January 2009 Citigroup, 80% owner of STU, announced that it was splitting itself into two pieces with the quality assets such as private and investment banking and its credit card and consumer banking businesses being held by Citicorp and the lesser quality businesses, such as its brokerage business and STU, being held by Citi Holdings. Citigroup made it clear in a conference call with investors that the restructuring was done in order to sell its "non-core" businesses that were being transferred to Citi Holdings. Thus, both prior to and after the split up

18

of Citigroup, defendants had a motive to make STU more attractive as a takeover candidate in

order to maximize the payouts to Citigroup.

59. After the Citigroup split was announced, STU reported fourth quarter (4Q 2008)

and year end 2008 results on January 23, 2009, as follows:

> net income of $76.2 million, or $3.81 per share, for the year ended December 31,
> 2008, a decrease of $106.5 million (58%) compared to net income of $182.7
> million, or $9.13 per share, reported for 2007. The unprecedented disruption and
> lack of liquidity in the financial markets has significantly affected the Company's
> operations. These conditions contributed to a reduction in net interest income of
> $31.5 million (after tax) for 2008 as compared to 2007 and also limited the
> Company's ability to sell and securitize loans, which resulted in a year-over-year
> decrease in associated gains of $66.3 million (after-tax). These decreases were
> offset by net increases in mark-to-market gains on the Company's retained
> interests and associated hedges, which are recorded in fee and other income.

60. Despite these losses Reardon told the market that it was in a position to create

long-term value for its investors: "We continued to experience challenging market conditions in

the U.S. and global economies during 2008. Over the course of the year, we have demonstrated

our resourcefulness by implementing initiatives designed to minimize the impact of external

economic conditions on our net interest margin while also decreasing operating expenses. These

actions have helped us weather these difficult market conditions and provide opportunities to

generate long-term shareholder value."

61. This same press release reported that:

> During the twelve months ended December 31, 2008, the Company's managed
> student loan portfolio *grew by $4.8 billion (13%)* to $42.1 billion, reflecting the
> Company's continued *strong origination performance*. The managed portfolio
> includes $25.6 billion of Company-owned loan assets and $16.5 billion of loans
> serviced on behalf of securitization trusts or other lenders. Originations for the
> year included FFELP Stafford and PLUS originations of $5.7 billion, a 25%
> increase from 2007. The Company also made new CitiAssist loan commitments
> of $1.8 billion, which were consistent with the same period of 2007.

* * *

19

The Company's allowance for loan losses at December 31, 2008 was $110.3 million compared to $42.1 million at December 31, 2007. This increase of $68.2 million includes $48.9 million related to the Uninsured CitiAssist Custom portfolio and is due to seasoning of the portfolio and higher volume.

* * *

During 2008, the Company tightened underwriting standards in an effort to significantly reduce the origination of new Uninsured CitiAssist Custom loans and improve the overall asset quality in response to the economic environment.

(Emphasis added).

62.     STU further reported loan assets of $24.6 billion, $5.8 billion of which consisted of higher risk CitiAssist loans.

63.     These statements were false and misleading for the following reasons:

a.     STU's loan loss provisions were inadequate, and too low to cover for the probable defaults in STU's CitiAssist program.

b.     STU failed to take adequate impairment charges to reflect the reduced fair market value of its loan assets.

c.     STU failed to adequately disclose known trends in STU's business which dramatically increased the likelihood of further loan defaults and losses which would need to be absorbed by the Company.

d.     the Company falsely represented to the market that it had increased its underwriting standards, while in actuality STU continued to write high-risk uninsured loans.

64.     On February 27, 2009, the Company had no choice but to start to admit – but not fully and completely – that (a) certain of its loans held for sale were impaired and needed to be written down and transferred back into the Company's loan portfolio, (b) the Company further increased its loan loss reserves, reflecting the continued "seasoning" of the uninsured CitiAssist loan portfolio, and (c) the Company had "implemented initiatives designed to minimize the

impact of external economic conditions and decrease operating expenses," including refining its

underwriting standards and improving its private education loan product (i.e., its CitiAssist

loans).

65.    While these statements were partial disclosures of the truth -- causing the STU

stock price to decline from a close of $37.72 on February 27, 2009 to $30.47 the next trading day

on March 2, 2009 (and down to a close of $25.29 by March 5, 2009) -- these statements were

still materially false and misleading because of what STU failed to say, that is, it was not that the

Company was "refining its underwriting standards" and merely improving its CitiAssist product ,

but that it had all along been making loans to inappropriate customers in lower quality schools

and as such its loan loss reserves were understated and its financial results inflated.

66.    On April 27, 2009, STU reported first quarter 2009 (1Q 2009) results as follows:

net income of $7.5 million, or $0.38 per share, for the quarter ended March 31,
2009, a decrease of $7.7 million (51%) compared to net income of $15.2 million,
or $0.76 per share, reported for the same quarter of 2008. The Company's net
interest income of $58.1 million fell by $23.4 million reflecting margin
compression during the first quarter of 2009.  This decrease was partially offset
by a $9.3 million reduction in operating expenses and $4.2 million lower
provision for loan losses.

* * *

During the twelve-month period ended March 31, 2009, the Company's managed
*student loan portfolio grew by $4.9 billion (13%)* to $44.0 billion, reflecting the
Company's *continued strong origination performance* and higher Stafford loan
limits. The managed portfolio included $27.3 billion of Company-owned loan
assets and $16.7 billion of loans serviced on behalf of securitization trusts or other
lenders.   Originations for the quarter included FFELP Stafford and PLUS
originations of $2.2 billion, a *16% increase* from the same quarter of 2008 . . . .
The Company also made new CitiAssist  loan commitments of $0.6 billion, which
was 1% lower than the same quarter of 2008.

The Company's allowance for loan losses at March 31, 2009 was $111.4 million
compared to $110.3 million at December 31, 2008, an increase of $1.1 million.  In
addition, the provision for loan losses decreased $4.2 million versus the first
quarter of 2008.  The overall private credit delinquency rate continued to follow

21

expected seasonal patterns with a delinquency rate of 2.0% at the end of the first
quarter of 2009, compared to 1.9% at the end of the same quarter of 2008.

(Emphasis added).

67.    STU further reported loan assets of $25.2 billion, $5.9 billion of which consisted

of higher risk CitiAssist loans.

68.    These statements were false and misleading for the following reasons:

a.    STU's loan loss provisions were inadequate, and too low to cover for the

probable defaults in STU's CitiAssist program.

b.    STU failed to take adequate impairment charges to reflect the reduced fair

market value of its loan assets.

c.    STU failed to adequately disclose known trends in STU's business which

dramatically increased the likelihood of further loan defaults and losses which would need to be

absorbed by the Company.

d.    the Company falsely represented to the market that it had increased its

underwriting standards, while in actuality STU continued to write high-risk uninsured loans.

69.    On July 17, 2009, STU reported its second quarter 2009 (2Q 2009) financial

results as follows:

net income of $24.9 million, or $1.25 per share, for the quarter ended June 30,
2009, a decrease of $17.1 million (41%) compared to net income of $42.0 million,
or $2.10 per share, reported for the same quarter of 2008.

* * *

During the second quarter of 2009, the Company further diversified its sources of
funding by accessing $8.5 billion of secured borrowings from the U.S.
Department of Education sponsored conduit, Straight-A Funding, LLC (the
Conduit). The Company also continued to draw on financing through the
Department of Education's Loan Participation Purchase Program (the
Participation Program) by procuring an additional $0.6 billion of funding for its
current quarter disbursements.  The Company has funded $2.7 billion of FFEL
Program Stafford and PLUS Loan disbursements through the Participation

22

Program since its inception.  At June 30, 2009, $1.3 billion of funding under the Participation Program remained outstanding.  During the second quarter of 2009, the Company also completed a $1.2 billion sale of loans to the Department of Education through the Loan Purchase Commitment Program (the Purchase Program).  The proceeds of this sale were used to pay back funding from the Participation Program.

* * *

The Company's allowance for loan losses at June 30, 2009 was $128.7 million, an increase of $18.4 million compared to $110.3 million at December 31, 2008.  This increase is largely due to continued deterioration in the economic environment resulting in increases in loss rates for both the FFEL Program and private education loan portfolios.

70.    STU further reported loan assets of $25 billion, $5.9 billion of which consisted of higher risk CitiAssist loans.

71.    These statements were false and misleading for the following reasons:

a.    STU's loan loss provisions were inadequate, and too low to cover for the probable defaults in STU's CitiAssist program.

b.    STU failed to take adequate impairment charges to reflect the reduced fair market value of its loan assets.

c.    STU failed to adequately disclose known trends in STU's business which dramatically increased the likelihood of further loan defaults and losses which would need to be absorbed by the Company.

d.    the Company falsely represented to the market that it had increased its underwriting standards, while in actuality STU continued to write high-risk uninsured loans.

72.    Reardon again gave the market a positive report on the Company despite the fact that STU had not adequately reserved for its loan losses: "Although the credit markets remain challenging, we have made significant progress in strengthening our balance sheet as evidenced by both the expansion of our FFEL Program Stafford and PLUS Loan portfolios, as well as the

diversification of our funding sources.  These accomplishments are even more notable as they were achieved with the backdrop of us becoming a leaner organization, as we reported continued quarter-over-quarter expense reductions.  These successes position us to remain a leader in the student lending industry."

73.     STU's statements were materially false and misleading for the reasons set forth above, and for the additional reason that Reardon knew that STU was under-reserved for uninsured losses and thus was not in a "position … to remain a leader in the student loan lending industry."

74.     On October 15, 2009, STU reported third quarter 2009 (3Q 2009) results as follows:

> net income of $54.8 million, or $2.74 per share, for the quarter ended September 30, 2009, an increase of $49.4 million compared to net income of $5.4 million, or $0.27 per share, reported for the same quarter of 2008. This increase in net income reflected the *positive impact of improved market conditions* on the Company's retained interests in its off-balance sheet securitizations, gains on loan sales, lower provision for loan losses and reduced operating expenses.

> * * *

> During the third quarter of 2009, the Company leveraged its portfolio to secure an additional $5.2 billion of long-term structural liquidity.  This included $1.9 billion from the U.S. Department of Education sponsored conduit, Straight-A Funding, LLC (the Conduit). This brought the cumulative funding from the Conduit to $10.4 billion. The Company also executed two securitizations, a Federal Loan Consolidation securitization which provided $1.9 billion of funding, and a private education loan securitization under the Term Asset-Backed Securities Loan Facility which provided $1.4 billion of funding.

> * * *

> The Company also had a $28.8 million smaller write-down of its held for sale portfolio.  In addition, the Company recognized an increase in net mark-to-market gains of $21.7 million on the Company's derivatives and retained interests from securitizations, reflecting a slowdown in prepayments on securitized loans.  The Company's allowance for loan losses at September 30, 2009 was $141.3 million, an increase of $31.0 million compared to $110.3 million at December 31, 2008. This increase was largely due to continued deterioration in the economic

24

environment, an increase in expected loss rates, higher loan balances, seasoning of the portfolios as more loans entered repayment, and lower recovery rates. The provision for loan losses decreased by $8.1 million in the third quarter of 2009 compared to the same period in 2008. This decrease is primarily driven by specific reserves established in the third quarter of 2008 for a bankrupt proprietary school.

(Emphasis added).

75.     STU further reported loan assets of $26.2 billion, $7.4 billion of which consisted of higher risk CitiAssist loans.

76.     These statements were false and misleading for the following reasons:

a.     STU's loan loss provisions were inadequate, and too low to cover for the probable defaults in STU's CitiAssist program.

b.     STU failed to take adequate impairment charges to reflect the reduced fair market value of its loan assets.

c.     STU failed to adequately disclose known trends in STU's business which dramatically increased the likelihood of further loan defaults and losses which would need to be absorbed by the Company.

d.     the Company falsely represented to the market that it had increased its underwriting standards, while in actuality STU continued to write high-risk uninsured loans.

77.     On January 19, 2010, STU reported its fourth quarter (4Q 2009) and year end 2009 financial results, as follows:

net income of $125.7 million, or $6.28 per share, for the year ended December 31, 2009, *an increase of $52.2 million* compared to net income of $73.4 million, or $3.67 per share, reported for 2008. The Company's 2009 results benefited from gains on loan sales to the Department of Education, operating expense reductions and the positive impacts of improved market conditions on the Company's assets measured at fair value, which offset the 16% decrease in net interest income.

\* \* \*

25

The Company's managed student loan portfolio grew by $0.8 billion (2%) to $42.9 billion during 2009. The managed portfolio includes $28.3 billion of the Company's owned loan assets and $14.6 billion of loans serviced on behalf of securitization trusts or other lenders. Originations for the year ended December 31, 2009 included FFEL Program Stafford and PLUS loan originations of $5.8 billion, up modestly compared with the $5.7 billion originated in 2008. The Company also made new CitiAssist loan commitments of $1.2 billion during 2009, which was 29% lower than 2008 reflecting the Company's refined origination strategy.

* * *

The Company's allowance for loan losses at December 31, 2009 was $149.1 million, an increase of $38.8 million compared to $110.3 million at December 31, 2008. This increase is largely due to continued deterioration in the economic environment, higher loan balances, and seasoning of the portfolio as more loans entered repayment. The *provision for loan losses was virtually unchanged* from 2008 as the impact of economic deterioration and portfolio seasoning in 2009 replaced the large loan loss build for losses inherent in the higher risk private education loan segment of the Company's portfolio in 2008.

* * *

The Company's December 31, 2009 allowance for loan losses and related provision include $3.0 million related to the impact of adopting certain policy changes recommended by the Office of the Comptroller of the Currency in a January 8, 2010 supervisory letter. These proposed changes include, among other things, more rigorous requirements for participation in private education loan forbearance and loss mitigation programs, shorter forbearance periods and the requirement for minimum periods of payment performance between forbearance grants. These proposed changes are expected to materially increase the Company's allowance for loan losses and related provision beginning in 2010.

(Emphasis added).

78.     STU further reported loan assets of $26 billion, $7.4 billion of which consisted of higher risk CitiAssist loans.

79.     These statements were false and misleading for the following reasons:

        a.   STU's loan loss provisions were inadequate, and too low to cover for the probable defaults in STU's CitiAssist program.

b.  STU failed to take adequate impairment charges to reflect the reduced fair market value of its loan assets.

c.  STU failed to adequately disclose known trends in STU's business which dramatically increased the likelihood of further loan defaults and losses which would need to be absorbed by the Company.

d.  the Company falsely represented to the market that it had increased its underwriting standards, while in actuality STU continued to write high-risk uninsured loans.

80.  The 2009 Annual Report to Shareholders filed with the SEC on February 26, 2010, was equally misleading, for the same reasons set forth above.  In addition, the 2009 Annual Report was misleading with respect to its purported success with CitiAssist loans, as follows:

> In 2009, SLC earned $125.7 million, illustrating the company's ability to leverage affordable funding, take advantage of positive momentum in the capital markets and apply strict expense discipline.  We originated $5.8 billion of Federal Family Education Loan Program (FFELP) Stafford and PLUS Loans, up modestly from 2008.  *Our CitiAssist Loan commitments of $1.2 billion reflect the refinement of our private loan strategy to ensure profitable originations amidst a challenging funding environment*. Year over year, SLC increased managed assets by $0.8 billion to $42.9 billion during 2009.
>
> Our results exemplify the many steps that we have taken in an effort to *preserve and grow long-term value* while managing our franchise in a particularly volatile business cycle.  *To this end, we have streamlined our company for greater efficiency, managed expenses prudently, applied balanced credit risk management and ensured profitable loan originations*.
>
> While we anticipate significant changes in the education finance industry, we believe we are *well positioned to remain an innovative and efficient leader* as the market adjusts.  To illustrate, as one of the first private student loan lenders, [STU] has extensive experience in predicting and managing portfolio performance and meeting the unique financing needs of our customers.  *Our CitiAssist Loan product suite is one of the best known brands and most successful product offerings in the industry*.
>
> (Emphasis added).

81.     Despite this positive outlook and upbeat sentiment, the Company had discontinued the Uninsured CitiAssist Custom Loan program and "significantly reduced the volume of originations at certain schools" because its underwriting standards were deemed to be so inadequate.

82.     Moreover, because the Company "refined [its] origination strategy, which included, among other things, changes to its underwriting standards" its CitiAssist loan commitments in 2009 were significantly lower than 2008.  In other words, the Company got out of its risky business altogether and tightened its underwriting standards to the point that it "significantly" reduced certain of its loan commitments.

83.     On April 19, 2010, STU reported first quarter 2010 (1Q 2010) financial results, as follows:

> net income of $0.5 million, or $0.02 per share, for the quarter ended March 31, 2010, a decrease of $7.1 million compared to net income of $7.5 million, or $0.38 per share, reported for the same quarter of 2009.  This decrease reflected a higher provision for loan losses, increased funding costs, and a decrease in other income which offset a 46% increase in net interest income. These changes are largely due to the adoption of new accounting standards which resulted in the consolidation of the Company's previously unconsolidated securitization trusts, the impact of the economic environment on funding costs, and increased credit loss provisions.
>
> * * *
>
> Originations for the quarter ended March 31, 2010 included FFEL Program Stafford and PLUS loan originations of $2.0 billion, a decrease of 8% as compared to the $2.2 billion originated in the first quarter of 2009.  The Company also made new CitiAssist  loan commitments of $0.3 billion during the first quarter of 2010, which was 49% lower than the same period in 2009, reflecting the Company's refined origination strategy.
>
> * * *
>
> The Company's allowance for loan losses at March 31, 2010 *was $173.2 million, an increase of $24.1 million compared to $149.1 million at December 31, 2009. This increase reflects continued performance deterioration from the economic environment, seasoning of the uninsured CitiAssist Standard portfolio, $6.3 million of additional reserves for newly consolidated securitization loan*

28

*assets and $5.1 million associated with private education loan forbearance policy
changes.  These policy changes will result in the Company limiting its borrower
assistance programs and are expected to materially increase credit losses
beginning in the fourth quarter of 2010.*

84.     STU further reported loan assets of $39.8 billion, $9.9 billion of which consisted

of higher risk CitiAssist loans.  The dramatic escalation of on-balance sheet loan assets was the

result of STU having to consolidate certain off-balance securitized loan assets in order to comply

with GAAP.

85.     While these statements were a partial disclosure of the truth, resulting in a stock

price drop from $34.21 at the close on April 16, 2010 to a close of $31.59 on April 19, 2010 (a

$2.62 drop, or 7.66%, on heavier than normal trading), these statements continued to be false and

misleading for the following reasons:

        a.  STU's loan loss provisions were inadequate, and too low to cover for the

probable defaults in STU's CitiAssist program.

        b.  STU failed to take adequate impairment charges to reflect the reduced fair

market value of its loan assets.

        c.  STU failed to adequately disclose known trends in STU's business which

dramatically increased the likelihood of further loan defaults and losses which would need to be

absorbed by the Company.

        d.      the Company falsely represented to the market that it had increased its

underwriting standards, while in actuality STU continued to write high-risk uninsured loans.

86.     Despite these underwhelming results in the 1Q 2009, Reardon again falsely

assured investors that the Company was in a strong position: "[W]e believe the repositioning

efforts we have taken, including reducing our expense base, *modifying pricing on our private

education loan product*, securing a new funding arrangement and continuing to use the capital

markets for funding, *have put us in a strong position to continue our mission to assist students with financing the education of their choice through our private education loan product.*"

(Emphasis Added)

87.    On July 16, 2010, STU reported:

net income of $20.8 million, or $1.04 per share, for the quarter ended June 30, 2010, a decrease of $4.4 million compared to net income of $25.3 million, or $1.26 per share, reported for the same quarter of 2009.  This decrease reflected higher funding costs and the Company's decision to defer planned loan sales to the Department of Education (the Department) through the Loan Purchase Commitment Program (the Purchase Program) until later in the year, which more than offset the positive impact of the consolidation of the Company's previously unconsolidated securitization trusts.

* * *

During the twelve-month period ended June 30, 2010, the Company's managed student loan portfolio increased by $1.2 billion (3%) to $44.2 billion.  The managed portfolio includes $43.9 billion of the Company's owned loan assets of which $37.9 billion has been pledged as collateral against secured borrowings, approximately $4.7 billion of which is expected to be sold to the Department later in the year . . . .   The Company also made new private education loan commitments of $0.1 billion during the second quarter of 2010, which was 40% lower than the same period in 2009, reflecting the Company's refined origination strategy.

* * *

*The Company's allowance for loan losses at June 30, 2010 was $173.6 million, an increase of $24.5 million compared to $149.1 million at December 31, 2009. This increase primarily reflects $18.7 million associated with private education loan forbearance policy changes and $6.3 million related to newly consolidated securitization loan assets.  These forbearance policy changes will result in the Company limiting its borrower assistance programs and are expected to increase credit losses beginning in the fourth quarter of 2010.*

(Emphasis added).

88.    From 1Q 2010 to the 2Q 2010, STU did not increase its provisions for loan losses at all, and held them steady at around $173 million.  To justify this decision, the Company stated that "[c]redit loss experience in 2010 has generally been consistent with expectations and, as a

result, no increases in the Company's allowance for loan losses have been required."  In fact, the Company further highlighted that its provision for loan losses had actually *decreased by $3.4 million* from same period reporting in 2009, again signaling to investors that the Company's loans were performing well.

89.     STU reported $39.2 billion in assets, $9.9 billion of which consisted of higher risk CitiAssist loans.

90.     In connection with its reported results, Reardon again provided his positive, but misleading, spin on STU's CitiAssist loan program, as follows: "In moving forward, we will continue to focus on our private education loan business.  We believe the progress we've made in strengthening our balance sheet through securing long-term funding that is aligned with the tenor of our assets and refining our origination strategy to ensure profitable loan originations, have positioned us for success as we continue making this transition."

91.     These statements were false and misleading for the following reasons:

a.   STU's loan loss provisions were inadequate, and too low to cover for the probable defaults in STU's CitiAssist program.

b.   STU failed to take adequate impairment charges to reflect the reduced fair market value of its loan assets.

c.   STU failed to adequately disclose known trends in STU's business which dramatically increased the likelihood of further loan defaults and losses which would need to be absorbed by the Company.

d.     STU falsely represented to the market that it had increased its underwriting standards, while in actuality STU continued to write high-risk uninsured loans.

e.    STU again misled the public by failing to explain that it knew that loans it was putting in forbearance were actually defaults and it had failed to adequately reserve for these losses.

92.    On September 17, 2010 in a press release entitled "The Student Loan Corporation to Be Sold in a Series of Transactions" STU announced that it and Discover had entered into a definitive agreement for Discover to acquire STU, and thereby become the owner of its private student loan business as well as $4 billion of its private student loans.  The press release also said that separately and immediately prior to the transaction, (i) Sallie Mae would acquire from STU $28 billion of securitized federal student loans and related assets and (ii) CBNA would acquire from STU certain federal and private student loans and other assets totaling $8.7 billion.  Upon the closing of the transactions described above, shareholders of STU were to receive $30 per share.

93.    Reardon supported the transactions stating: "We are pleased that Discover intends to leverage and build upon [STU's] 52 years of experience, proven market leadership, robust distribution, and private loan product expertise to continue serving schools, students and families nationwide."

94.    On September 23, 2010, the Company released the Merger Agreement for the above mentioned transactions.  As part of the Merger Agreement and for the first time, STU admitted that approximately *$900 million* of its loans had been carried on the books as viable assets, when in fact those loans were virtually, if not completely, worthless.  Indeed, the Company admitted that the actual losses and impairment charges recorded could differ materially from these estimates.

95.     The Company announced that it had transferred loans to be sold to CBNA and Sallie Mae into loans held for sale, which are required to be recorded at the lower of cost or fair value.  The Company stated that it determined the fair value of certain of these student loan portfolios were impaired.  Based on the terms of the Agreements, the Company expected to record a pre-tax impairment charge in the third quarter of 2010 of approximately $0.8 to $1 billion to reduce the carrying value of these portfolios to the lower of cost or fair value.

96.     When the third quarter 2010 results were announced on October 18, 2010, STU reported a net loss of $539.6 million, or $26.98 a share, compared with 3Q 2009 earnings of $54.8 million, or $2.74 a share.  These results reflected an after tax write down of $562.2 million on the loans being sold to Sallie Mae and CBNA.  The pre-tax impairment charge on the loans was determined to be $900.8 million.

97.     During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial results.  Defendants claimed that STU maintained an adequate level of loan loss reserves on its student loan portfolios.  However, the Company could not truthfully make such representations about the adequacy of its loan loss reserve because STU's underwriting policies were inadequate.

98.     In addition, STU manipulated its forbearance process whereby delinquent loans were maintained in forbearance status, justifying inadequate loan loss reserves and concealing the poor and deteriorating quality of the loans and the inability of borrowers to timely repay the loans.

99.     As a result of defendants' false statements, STU's stock price traded at inflated levels during the Class Period.  However, after the above partial and full revelations seeped into the market,

the Company's public shareholders suffered significant losses, sending STU stock price down from a high of over $135 a share to a low of less than $30 per share during the Class Period.

## VII.    STU'S FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD

100.    In order to inflate the price of STU's stock, defendants caused the Company to falsely report its results for year-end 2007 and for each of the following financial reporting periods through the announcement of the sale of the company and the write-down of its assets in September 2010 by failing to adequately accrue its loan loss provisions, which overstated the Company's net income, and by concealing known trends and uncertainties.

101.    The results during the Class Period were included in its Forms 8-K, 10-K and 10-Qs filed with the SEC.  The results were also included in press releases disseminated to the public and filed with the SEC.

102.    These representations were materially false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP. The financial information was not a "fair representation" of STU's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

103.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.

104.    SEC Regulation S-X (17 C.F.R. §210.4-01 (a)(1)) states that financial statements filed with the SEC, which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

105.    With respect to accounting for contingencies, GAAP, as set forth in FASB Statement of Financial Accounting Standard (SFAS) No. 5, *Accounting for Contingencies,* ¶8, states:

An estimated loss from a loss contingency . . . shall be accrued by a charge to income if *both* of the following conditions are met:

a.    Information available prior to issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

b.    The amount of loss can be reasonably estimated. (Footnote omitted, emphasis in original.)

106.    In violation of GAAP, STU failed to provide an adequate reserve for its loan loss provision.  Despite evidence that the Company was experiencing a high level of delinquency and charge-offs in its loan portfolio, the Company failed to provide an adequate reserve for its subprime borrowers.

107.    Ultimately, STU was forced to write-down over $900 million of bad loans.

108.    Furthermore, during the Class Period, STU failed to disclose known trends and uncertainties concerning its loan portfolio in violation of SEC regulations.

109.    Under SEC Regulations, Item 7 of Form 10-K and Item 2 of Form 10-Q, Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), require the issuer to furnish information required by Item 303 of Regulation S-K [17 C.F.R. §229.303] ("Item 303").  In discussing results of operations, Item 303 requires the registrant to:

Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

110.    The instructions to paragraph 303(a) further state:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results . . . .

111.   In addition, the SEC, in its May 18, 1989 Interpretive Release No. 34-26831, indicated that registrants should employ the following two-step analysis in determining when a known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have a material effect on the registrant's financial condition or results of operation.

112.   The MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future. As Securities Act Release No. 33-6711 states:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company.

113.   Item 303 states:

> To the extent that the financial statements disclose material increases in net sales or revenues, provide a narrative discussion of the extent to which such increases are attributable to increases in prices or to increases in the volume or amount of goods or services being sold or to the introduction of new products or services.

114.   And further states:

> Where the consolidated financial statements reveal material changes from year to year in one or more line items, the causes for the changes shall be described to the extent necessary to an understanding of the registrant's businesses as a whole . . . .

115.   According to Securities Act Release No. 33-6349:

It is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company.

116.    Nonetheless, in violation of both GAAP and SEC rules, STU's Class Period Forms 8-K, 10-K and 10-Q failed to disclose known trends and uncertainties related to STU's operations.    Specifically they failed to disclose the following: that the Company was experiencing higher default and charge-off rates; that the Company had failed to engage in proper due diligence in making subprime loans to students; and, that the Company had failed to provide an adequate loan loss provision for its loan portfolio.

117.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

a.    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

b.    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

c.    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

d.    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers

securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

        e.   The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

        f.   The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

        g.   The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

        h.   The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

    118.   Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities

analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## VIII.   DEFENDANTS' SCIENTER

119.   In an attempt to profit from its student loans, and to raise capital to fund new loans, STU amassed its loans, securitized them, and sold the securitized loan products to investors at a premium.

120.   Securitizing loans allowed STU to bundle loans that would traditionally be kept on their books through maturity and instead transfer them to trusts and sell securities in the trusts with the loans as collateral.

121.   After subprime mortgages began to default *en masse*, investors began to pull out of all forms of opaque securitized loans, including securitized student loans.   With this knowledge, STU needed to ensure that investors in its securitized student loans remained comfortable with their investments in order to maintain this needed source of funds.

122.   In order to convince investors in these securitized loans to hold their investments, the Company needed the market to perceive that it was financially sound and that the loans underlying these securitized instruments were valuable and performing well.

123.   Thus, the Company, which was in need of income because of tightening federal laws and increasing default rates, had ample motive to misrepresent its true financial position in the marketplace during the Class Period.

124.   Furthermore, by the Spring of 2008, it became apparent that Citigroup was planning to restructure by dividing into two parts.   Citigroup would hold the "core" banking business and Citi Holdings would retain the rest of Citigroup's assets, including STU, that the Citigroup would seek to sell.

125.   On January 16, 2009, Citigroup officially announced it would realign into two businesses, Citicorp and Citi Holdings.

126.   Citi Holdings was described as "a group of non-core businesses that include attractive long-term businesses with strong market positions."

127.   Because the Citi Holding's assets, including STU, were for sale, the defendants were strongly motivated to conceal the toxic assets on STU's books, to overvalue the worth of STU's assets, and to create the false impression that STU's loans were performing well by maintaining only modest levels of loan loss provisions.  Thus, again, the defendants had motive to inflate its financial reporting to make the business more attractive to potential suitors.

128.   These dual motives led defendants to continue to disguise defaulting loans as being in forbearance and continuously make material false and misleading statements to the market about STU's true financial condition.

129.   Defendants Reardon, Guage and Morris, moreover, were incentivized by the Citi Defendants for their part in this scheme.  Not only did the Individual Defendants receive Citigroup stock options, as opposed to stock options in STU, but they were handed unwarranted change-in-control severance packages on the eve of the STU Transactions as hush money. While the Company's 2010 proxy statement (issued in April 2010) proudly proclaimed that "[a]s a general policy, the Company does not enter into individual agreements with executives that provide for severance payments or change in control protection, unless necessary to attract or retain personnel," this general policy was abandoned months later in July 2010, when, on the eve of inking the deals representing the STU Transactions, Reardon, Guage and Morris were each handed a generous change in control pay package that had nothing to do with "attracting" or "retaining" their services, but effectively doubled their annual compensation.

## IX.    LOSS CAUSATION/ECONOMIC LOSS

130.    By misrepresenting its financial outlook, the defendants presented a misleading picture of STU's business and prospects.  Thus, instead of truthfully disclosing during the Class Period that STU's business was not as healthy as represented, defendants falsely reported STU's financial outlook and its actual business prospects going forward.

131.    These claims of profitability caused and maintained the artificial inflation in STU's stock price throughout the Class Period and until the truth was revealed to the market.

132.    Defendants' false and misleading statements had the intended effect and caused STU's stock to trade at artificially inflated levels throughout the Class Period, reaching its Class Period high of over $120 per share.

133.    The truth about STU's business operations, finances, business metrics, and future business and financial prospects began to enter the market with a series of partial disclosures and revelations beginning in the first quarter of 2008, which were accompanied by false statements and continuing misrepresentations by defendants.  As a result, the artificial inflation in STU's stock price did not come out of the stock all at once, rather the artificial price inflation came out over time, in bits, pieces, and spurts as the stock continued to trade at artificially inflated, albeit lower, prices throughout the Class Period.

134.    As a direct result of defendants' admissions and the public revelations regarding the truth about STU's overstatement of its financial outlook and its actual business prospects going forward, STU's stock price plummeted from a high of over $135 per share during the Class Period to less than $30 per share. This drop removed the inflation from STU's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

X.      **CLASS ACTION ALLEGATIONS**

135.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired STU common stock during the Class Period (the "Class").  Excluded from the Class are defendants, other officers and directors of STU at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

136.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  At all relevant times, STU had over 20 million shares of stock outstanding, approximately 4 million of which were owned publicly by hundreds if not thousands of persons and entities.

137.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

        a.    whether the Securities Exchange Act of 1934 was violated by defendants;

        b.    whether defendants omitted and/or misrepresented material facts;

        c.    whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

        d.    whether defendants knew or deliberately disregarded that their statements were false and misleading;

        e.    whether the price of STU's common stock was artificially inflated; and

        f.    the extent of damage sustained by Class members and the appropriate measure of damages.

138.   Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from defendants' wrongful conduct.

139.   Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

140.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT ONE**
**For Violation of § 10(b) of the 1934 Act and Rule 10b-5**
**Against All Defendants (except the Citi Defendants)**

141.   Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

142.   During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

143.   Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

a.   employed devices, schemes and artifices to defraud;

b.   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.   engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of STU common stock during the Class Period.

144.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for STU common stock.  Plaintiff and the Class would not have purchased STU common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT TWO
### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants

145.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

146.    The Individual Defendants acted as controlling persons of STU within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, the Individual Defendants had the power and authority to cause STU to engage in the wrongful conduct complained of herein.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## COUNT THREE
### For Violation of §20(a) of the 1934 Act
### Against Citi Defendants

147.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

148.    The Citi Defendants acted as controlling persons of STU within the meaning of §20(a) of the 1934 Act.  By reason of its ownership of 80% of the Company, the Citi Defendants had the power and authority to cause STU to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Citi Defendants are liable pursuant to §20(a) of the 1934 Act.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.   Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.   Awarding Plaintiff and the members of the Class damages, including interest;

C.   Awarding Plaintiff reasonable costs and attorneys' fees; and

D.   Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## XII.   JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 3, 2012

GRANT & EISENHOFER P.A.

By: _____
Jay W. Eisenhofer
Daniel L. Berger
485 Lexington Avenue, 29th Floor
New York, New York  10017
Tel:  646-722-8500
Fax:  646-722-8501

GARDY & NOTIS, LLP
Mark C. Gardy
Meagan Farmer
501 Fifth Avenue, Suite 1408
New York, New York  10017
Tel:  212-905-0509
Fax:  212-905-0508

*Attorneys for Plaintiff Oklahoma Firefighters Pension*
*& Retirement System*

**CERTIFICATION OF**
**OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM**

I, Robert E. Jones, on behalf of the Oklahoma Firefighters Pension and Retirement System, make this Certification pursuant to 28 U.S.C. § 1746 and 15 U.S.C. § 78u-4, and state as follows:

1.      I am the Executive Director of the Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters"), a state agency that provides pension benefits to more than 21,000 participating members, including both active and retired firefighters and their beneficiaries. I am familiar with the matters set forth herein and am duly authorized to make this Certification on behalf of Oklahoma Firefighters.

2.      I have reviewed the Complaint in the securities class action lawsuit captioned *Oklahoma Firefighters Pension & Ret. Sys. v. Student Loan Corp., et al.* (S.D.N.Y.), and I submit this Certification in support of Oklahoma Firefighters' Complaint, and any subsequent motions for consolidation of related class actions, to be appointed lead plaintiff, and for approval of its selection of counsel (the "Motions"). Oklahoma Firefighters has authorized the filing of the Complaint and subsequent Motions.

3.      Attached as Schedule A is a list of all transactions in the common stock of the Student Loan Corporation ("SLU") for the time period January 15, 2008 and September 23, 2010, inclusive (the "Class Period").

4.      Oklahoma Firefighters did not purchase the securities that are the subject of the action at the direction of counsel or in order to participate in any private action. Oklahoma Firefighters invested in SLU securities solely for its own business purposes.

5.     Oklahoma Firefighters is willing and able to serve as lead plaintiff and class representative on behalf of the proposed class of persons who purchased SLU securities during the proposed class period, including providing testimony at deposition and trial, if necessary.

6.     Oklahoma Firefighters has sought to serve as lead plaintiff in the following class actions under the federal securities laws during the last three years:

- *City of Roseville Employees' Retirement System v. Textron, Inc. et al.*, Case No. 09-CV-00367-ML-LDA (D.R.I.);

- *Hill v. State Street Corp.*, Case No. 09-cv-12146-NG (D. Mass.);

- *City of Monroe Employees' Retirement System v. The Hartford Financial Services Group, Inc., et al.*, Case No. 10-cv-02835-NRB (S.D.N.Y.);

- *Jones v. Pfizer, Inc., et al.*, Case No. 10-cv-03864-AKH (S.D.N.Y.);

- *Kinnett v. Strayer Education, Inc. et al.*, Case No. 10-02317-SDM-MAP (M.D. Fla.);

- *Police Pension Fund of Peoria, et al. v. Capella Education Company, et al.*, Case No. 10-cv-04474-JRT (D. Minn.); and

- *Derchi-Russo v. Finisar Corporation, et al.*, Case No. 11-cv-01252-EJD (N.D. Cal.).

- *Husu v. Miller Energy Resources, et al.*, Case No. 3:11-CV-375 (E.D. Tenn.)

7.     Oklahoma Firefighters has served as lead plaintiff in the following class actions under the federal securities laws during the last three years:

- *Minneapolis Firefighters' Relief Assoc. v. Medtronic, Inc.*, Case No. 08-cv-06324-PAM-AJB (D. Minn.);

- *Kinnett v. Strayer Education, Inc. et al.*, Case no. 10-02317-SDM-MAP (M.D. Fla.); and

- *Police Pension Fund of Peoria, et al. v. Capella Education Company, et al.*, Case No. 10-cv-04474-JRT (D. Minn.).

8.     Oklahoma Firefighters will not accept any payment for serving as representative party on behalf of the class beyond its *pro rata* share of any recovery, except such reasonable

costs and expenses (excluding lost wages) relating to the representation of the class as may be ordered or approved by the Court.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 27th day of January 2012

Oklahoma Firefighters Pensions and Retirement System

By: _____

Robert E. Jones, Executive Director

## Schedule A
## Oklahoma Firefighters Pension and Retirement System

**Cusip:**            863902102
**Ticker:**           STU
**Class Period:**     January 15, 2008 through September 23, 2010

**Pre-Class Period Holdings:**            3,700

| Class Period Purchases | | | | Class Period Sales | | |
|---|---|---|---|---|---|---|
| **Trade Date** | **Quantity** | **Price** | | **Trade Date** | **Quantity** | **Price** |
| 04/17/08 | 360 | $104.96 | | 10/23/08 | 100 | $44.23 |
| 04/18/08 | 40 | $108.44 | | 10/24/08 | 10 | $41.99 |
| 04/24/08 | 20 | $105.11 | | 10/27/08 | 20 | $39.14 |
| 04/25/08 | 100 | $109.38 | | 10/28/08 | 30 | $38.07 |
| 07/14/08 | 230 | $95.27 | | 10/29/08 | 190 | $38.17 |
| 07/16/08 | 10 | $99.68 | | 10/30/08 | 70 | $37.25 |
| 07/17/08 | 40 | $103.89 | | 10/31/08 | 170 | $36.20 |
| 07/18/08 | 40 | $108.84 | | 11/03/08 | 1,080 | $36.42 |
| 07/21/08 | 130 | $112.68 | | 04/12/10 | 1,600 | $37.03 |
| 08/22/08 | 40 | $110.17 | | 04/12/10 | 2,800 | $37.25 |
| 08/25/08 | 80 | $110.05 | | 04/13/10 | 3,700 | $35.71 |
| 08/26/08 | 30 | $109.97 | | 04/14/10 | 1,100 | $35.47 |
| 09/11/08 | 190 | $110.81 | | 07/22/10 | 1,140 | $21.86 |
| 09/15/08 | 70 | $112.00 | | 08/24/10 | 110 | $21.24 |
| 09/16/08 | 290 | $107.13 | | 08/25/10 | 260 | $20.14 |
| 02/19/09 | 400 | $48.02 | | 08/26/10 | 100 | $19.66 |
| 02/20/09 | 400 | $47.01 | | 08/27/10 | 310 | $19.18 |
| 02/23/09 | 200 | $48.39 | | 09/07/10 | 270 | $19.04 |
| 02/24/09 | 100 | $47.43 | | 09/08/10 | 340 | $18.92 |
| 02/24/09 | 600 | $48.35 | | 09/09/10 | 160 | $19.26 |
| 02/26/09 | 800 | $44.76 | | 09/13/10 | 700 | $20.71 |
| 02/26/09 | 3,000 | $42.68 | | 09/14/10 | 220 | $20.43 |
| 03/26/10 | 70 | $34.94 | | 09/17/10 | 1,150 | $29.84 |
| 03/29/10 | 380 | $35.09 | | 09/29/10* | 510 | $29.75 |
| 03/30/10 | 280 | $34.93 | | 09/30/10* | 1,320 | $29.74 |
| 03/31/10 | 700 | $35.32 | | 10/01/10* | 1,350 | $29.73 |
| 04/01/10 | 280 | $35.84 | | 10/04/10* | 1,320 | $29.71 |
| 04/05/10 | 420 | $36.40 | | | | |
| 04/06/10 | 530 | $36.78 | | | | |
| 04/07/10 | 210 | $36.48 | | | | |
| 04/08/10 | 640 | $36.65 | | | | |
| 04/09/10 | 600 | $36.55 | | | | |
| 04/12/10 | 1,420 | $37.23 | | | | |
| 04/19/10 | 1,310 | $35.03 | | | | |
| 04/22/10 | 790 | $30.50 | | | | |
| 05/18/10 | 1,060 | $28.13 | | | | |
| 06/09/10 | 570 | $27.31 | | | | |

**\* Post class period sales during the 90-day look-back period**