UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
OKLAHOMA    FIREFIGHTERS    PENSION    &
RETIREMENT  SYSTEM  and  ELKHORN  PARTNERS
LIMITED PARTNERSHIP, individually and on
behalf of all others similarly situated,

                    Plaintiffs,

          - against -

STUDENT   LOAN   CORPORATION,   MICHAEL   J.
REARDON,   JOSEPH   P.   GUAGE,   SCOT   H.
PARNELL,  CITIGROUP  INC.,  CITIBANK  N.A.,
CITI  HOLDINGS,  INC.,  DISCOVER  FINANCIAL
SERVICES,

                    Defendants.
------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/25/2013
```

**MEMORANDUM AND ORDER**

12 Civ. 895 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

     Lead   plaintiffs   Oklahoma   Firefighters   Pension   and

Retirement   System   and   Elkhorn   Partners   LP   (collectively,

"plaintiffs")  bring  this  putative  class  action  against  Student

Loan   Corporation   ("Student   Loan   Corp."),   once   a   leading

originator  of  student  loans,  and  certain  of  its  former  officers,

as   well   as   Citigroup,   Inc.,   Citibank,   N.A.   ("CBNA"),   Citi

Holdings,   Inc.,   and   Discover   Financial   Services   ("Discover")

(collectively,  "defendants")  on  behalf  of  themselves  and  all

persons  who  purchased  Student  Loan  Corp.  common  stock  between

October  15,  2009  and  September  23,  2010,  inclusive  (the  "class

period").

1

Plaintiffs' consolidated amended complaint (the "CAC") contains two core allegations.  First, it alleges that Student Loan Corp. failed to maintain adequate reserves for estimated losses to its student loan portfolios in violation of generally accepted accounting principles ("GAAP"), despite the increased size and risk exposure of those portfolios during the class period.  It further alleges that Student Loan Corp. and its officers materially misrepresented the size and risk exposure of the company's loan portfolios in violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, promulgated thereunder, thereby artificially inflating the price of its common stock during the class period.

Defendants have moved to dismiss the CAC for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth below, defendants' motion is granted and the action is dismissed.

## BACKGROUND

### I. Factual Background

The following allegations are drawn from the CAC and are assumed to be true for the purposes of this motion.[1]  See Global

---

[1] While the following facts are derived primarily from the CAC, we cite throughout to Defendants' Memorandum of Law in Support of their Motion to Dismiss the Consolidated Amended Complaint ("Def. Mem."), the Declaration of

Network Commc'ns, Inc. v. City of N.Y., 458 F.3d 150, 154 (2d Cir. 2006).   We also consider any statements or documents incorporated into the CAC by reference, legally required public disclosure documents filed with the SEC, and documents upon which plaintiffs relied in bringing the action.   See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

**A.  The Parties**

Plaintiffs bring suit primarily against Student Loan Corp., a formerly publicly-traded Delaware corporation that was one of the largest originators and holders of student loans in the United States.  (CAC ¶¶ 12, 18.)  Prior to its merger with a subsidiary of Discover on December 31, 2010, Student Loan Corp. was a subsidiary of defendant CBNA, and then defendant Citi Holdings, Inc., an entity that previously held 80% of its common stock.  (Id. ¶¶ 18, 24-25.)

In addition, plaintiffs have sued three former Student Loan Corp. officers who they allege possessed the power and authority to review, correct, and control the contents of the company's financial disclosures.  (Id. ¶ 22.) Defendant Michael J. Reardon

---

Jay B. Kasner in Support of Defendants' Motion to Dismiss the Consolidated Amended Complaint ("Kasner Decl.") and the exhibits annexed thereto, Plaintiffs' Opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint ("Pl. Opp."), and Defendants' Reply in Support of their Motion to Dismiss the Consolidated Amended Complaint ("Def. Reply").

("Reardon") served as Chief Executive Officer ("CEO") of Student Loan Corp. from July 2007 until December 31, 2010, and as Chairman of its Board of Directors from January 2006 until December 31, 2010. (Id. ¶ 19.)   Defendant Scot H. Parnell ("Parnell") was the Chief Financial Officer ("CFO") of Student Loan Corp. from February 29, 2008 until February 12, 2010. (Id. ¶ 20.)   Defendant Joseph P. Guage ("Guage") was Student Loan Corp.'s Controller and Chief Accounting Officer from August 7, 2007 until February 12, 2010, when he was appointed interim CFO. (Id. ¶ 21.)   He became CEO of Student Loan Corp. effective March 8, 2010. (Id.)

**B. Student Loan Corp.'s Loan Portfolios**

### 1. Federal Loan Portfolio

Prior to and during the class period, Student Loan Corp. originated, managed, and serviced a variety of student loans, the majority of which were authorized by the Department of Education under the Federal Family Education Loan ("FFEL") program. (Id. ¶ 28.)   Students were required to meet strict Department of Education underwriting criteria to qualify to receive FFEL loans, including attendance at an eligible educational institution and minimum creditworthiness. (Id. ¶ 29.)   Accordingly, the federal government guaranteed a large portion of FFEL loans, such that Student Loan Corp. typically

4

received 97% or 98% reimbursement on substantially all FFEL default claims. (Def. Mem. at 7; Kasner Decl. Ex. E, at 3, 42.)

In particular, Student Loan Corp. offered three types of FFEL loans: (i) Subsidized Federal Stafford loans, available to students who met certain need criteria; (ii) Unsubsidized Federal Stafford loans, available to students who did not qualify for subsidized Stafford loans; and (iii) Federal PLUS loans, available to parents of dependent students and to graduate and professional students. (CAC ¶ 28.) However, Student Loan Corp. stopped offering new FFEL loans as of July 1, 2010, the effective date of the Student Aid and Fiscal Responsibility Act ("SAFRA"), which eliminated the FFEL program and brought all federal student lending under the Federal Direct Loan Program. (Id. ¶ 45; Kasner Decl. Ex. H, at 26, 43.)

### 2. Private Loan Portfolio

Student Loan Corp. also offered private student loans through its CitiAssist program, which provided financing to students who did not qualify for federal loan programs or who sought additional funding beyond that available under government programs and other sources. It offered three types of private CitiAssist loans: (i) insured CitiAssist Standard loans, which were originated using standard underwriting criteria and carried certain third-party private insurance guarantees; (ii) uninsured

CitiAssist Standard loans, which were similarly originated using standard underwriting criteria but were not privately insured; and (iii) uninsured CitiAssist Custom loans, which were originated under less stringent underwriting criteria and made available to students attending non-traditional educational institutions. (CAC ¶ 30; Def. Mem. at 7.)

In order to comply with certain legal and regulatory requirements, the CitiAssist loans were originated by Student Loan Corp.'s parent company, CBNA, pursuant to the terms of an intercompany trust agreement (the "intercompany agreement"). (CAC ¶ 30.) CBNA kept the loans on its books while disbursing the proceeds to borrowers, but Student Loan Corp. was obligated to purchase the loans from CBNA after final disbursement, at which point they were transferred to its books. (See Kasner Decl. Ex. E, at 18.)

Because the CitiAssist loans were not issued under the FFEL program, they were not guaranteed against default by the federal government. However, Student Loan Corp. took steps to mitigate the credit risk associated with its CitiAssist loans, including seeking private insurance from third parties or participating in risk-sharing agreements with the educational institutions themselves. (See Kasner Decl. Ex. E, at 24.) Moreover, in November 2008, the company stopped originating new CitiAssist

6

Custom loans altogether. (See id.) Nevertheless, it continued to purchase both insured and uninsured CBNA-originated CitiAssist loans pursuant to its preexisting obligation to do so under the intercompany agreement. (Id.)

**C. Loan Loss Reserves**

Plaintiff's primary claim for relief alleges that Student Loan Corp. violated GAAP by failing to record sufficient reserves for losses to its student loan portfolios. (CAC ¶ 7.) GAAP requires lenders to set aside such reserves on uncollectible loans that they hold for investment, or for "the foreseeable future or until maturity or payoff." Financial Accounting Standards Board Accounting Standards Codification ("ASC") 310-10-35-47. Lenders must maintain a loan loss allowance account as an offset to its loans receivable, and periodically record what are called "loan loss provisions" as charges to income in order to replenish that account. Financial Accounting Standard ("FAS") No. 01-6 ¶ 8(d); (CAC ¶ 85). When the loan eventually goes bad, the asset is removed from the lender's books and the allowance account is charged ("charged off") for the carrying value of that loan.

GAAP specifies the conditions under which a lender should record loan loss provisions. Because "it is usually difficult, even with hindsight, to identify any single event that made a

particular loan uncollectible," GAAP requires that "impairment in receivables shall be recognized when, based on all available information, it is <u>probable that a loss has been incurred</u> based on past events and conditions existing at the date of the financial statements."   ASC 310-10-35-4(a) (emphasis added). Thus, lenders are instructed to record loss provisions only when both of the following conditions are met: (1) information available prior to issuance of the financial statement indicates that it is probable that an asset has been impaired; and (2) the amount of loss can be reasonably estimated.   FAS No. 5 ¶ 8. Whether the amount of loss can be reasonably estimated should depend upon a variety of market and institution-specific factors, such as an institution's historical loss experience, information about the ability of individual debtors to pay, and appraisal of the receivables in light of the economic environment. (CAC ¶ 60); <u>see</u> ASC 310-10-35-41.

GAAP further requires that a lender's income be charged off in the period in which it deems the loan uncollectible, which is the period in which the estimated loss is probable to have been incurred.   ASC 310-10-35-41.   Thus, losses "shall not be recognized before it is probable that they have been incurred, even though it may be probable based on past experience that losses will be incurred in the future."   <u>Id.</u> 310-10-35-4(b).

At all times during the class period, Student Loan Corp. maintained a loan loss allowance to offset estimated probable losses to its private loan portfolio and the non-guaranteed portion of its FFEL loan portfolio. (Def. Mem. at 8; <u>see</u> Kasner Decl. Ex. D, at 7.) It recorded quarterly loan loss provisions against its income, as disclosed in each of its Forms 10-Q, and credited the balance of its loan loss allowance accordingly. (<u>See</u> Kasner Decl. Ex. D, at 7, Ex. E, at 89, Ex. H, at 31-32, Ex. I, at 32, Ex. K, at 37.) Consistent with GAAP, Student Loan Corp. also disclosed the factors it considered when performing its loss estimation analysis, including its "historical delinquency and credit loss experience adjusted for aging of the portfolio," "expected market conditions," and "other factors not captured by historical trends," such as "internal policy changes, regulatory changes, and general economic conditions affecting borrowers, private insurers, risk sharers, and higher education institution clients." (<u>See</u> Kasner Decl. Ex. D, at 7.)

Plaintiffs allege that Student Loan Corp. violated GAAP by failing to record adequate loan loss provisions during the class period, despite the increased risk exposure of its loan portfolios and the impact of the declining economy. Because loan loss provisions are charged against income for accounting purposes, plaintiffs submit that the company's under-allocation

of reserves allowed it to materially overstate its income for each quarter during the class period, rendering its assets more attractive to investors in its securitized products and potential buyers of the company. (CAC ¶ 173.) As discussed below, plaintiffs support this claim by examining Student Loan Corp.'s quarterly loan loss provisions as a percentage of its total loan assets, which they refer to as the company's "reserve ratio," for each of its loan portfolios.[2]

### 1. Student Loan Corp.'s Alleged Failure to Maintain Adequate Allowance for Losses to its Private Loans

Plaintiffs assert that Student Loan Corp. failed to increase loan loss reserves in a manner proportionate to its private loan portfolio's growing size and risk exposure. (Id. ¶¶ 56, 93.) For example, plaintiffs allege that the company acquired $1.5 billion in CitiAssist Standard loans from CBNA during the third quarter of 2009, but allocated only $19.1 million for loan loss reserves during that period. Although the company had increased its loan loss allowance by $3.5 million from second quarter 2009, plaintiffs claim the increase was "woefully inadequate" when viewed as a percentage of total private loan commitments. (Id. ¶ 63.) Thus, while plaintiffs

---

[2] Plaintiffs further claim that the $900.8 million impairment charge recorded in September 2010 on loans held for sale to CBNA and Sallie Mae revealed that Student Loan Corp. had failed to previously record adequate loan loss provisions during the class period. (CAC ¶ 111.) This allegation will be explored in further detail in Part I.E.2, infra.

concede that the balance of Student Loan Corp.'s allowance account increased quarter to quarter, they contend, for example, that the company's private loan loss reserve ratio decreased by 50%, from 6.65% at the end of June 2009 to 3.34% at the end of September 2009. (Id. ¶¶ 91-92; see also id. ¶¶ 67-68, 97-98 (making similar allegations with respect to first and second quarters 2010).)

## 2. Student Loan Corp.'s Alleged Failure to Maintain Adequate Allowance for Losses to its Federal Loans

Despite the strict underwriting criteria to which FFEL loans were subject, plaintiffs maintain that Student Loan Corp.'s federal loan portfolio was exposed to significant risk during the class period, largely due to $11.8 billion in previously securitized federal loans that the company was required to reconsolidate, or put back on its balance sheet, in January 2010. (Id. ¶ 104.) Despite the resulting increase to Student Loan Corp.'s federal loan balance during the class period, plaintiffs allege that Student Loan Corp. underreserved for probable loan losses by reducing its federal loan loss reserve ratio from .12% to .08%. (Id. ¶¶ 69-71, 105.) They further assert that, as of June 30, 2010, federal loans represented 74.31% of the company's total loans held for investment, but only 12.74% of its total allowance for loan

losses, which exploited the perception among investors that federal loans were "virtually risk-free." (Id. 107.)

Plaintiffs support this claim by comparing Student Loan Corp.'s federal loan loss reserve ratio to that of its largest competitor, Sallie Mae.[3] (Id. ¶¶ 6, 69-70, 101-109, 118-120, 136, 144, 157.) At the end of 2007, both Student Loan Corp. and Sallie Mae had recorded an allowance for FFEL loan losses equal to .08% of their total federal loans. (Id. ¶ 102.) Thereafter, their respective reserve ratios began to diverge. As shown in the chart that appears at CAC ¶ 102, Sallie Mae's reserve ratio increased gradually from .08% at the end of 2007 to .14% at the end of third quarter 2009, and up to .15% at the end of second quarter 2010. However, while Student Loan Corp. increased its reserve ratio to .14% at the end of third quarter 2009, it decreased it to .12% at the end of 2009 and to .08% at the end of the first and second quarters of 2010. (Id.) Plaintiffs submit that, had Student Loan Corp. allocated reserves for federal loan losses consistent with those of Sallie Mae during the class period, it would have been required to set aside an additional $3.8 million, which would have contributed to a net income reduction of $1.45 per share. (Id. ¶¶ 136-137.)

---

[3] Plaintiffs maintain that this comparison is appropriate because FFEL loans are subject to the same stringent underwriting criteria, regardless of lender, and because both Student Loan Corp. and Sallie Mae were negatively impacted by legislative changes to the FFEL program. (CAC ¶ 101.)

**D. The Allegedly False and Misleading Disclosures Issued During the Class Period**

In addition to their GAAP claims, plaintiffs allege that Student Loan Corp. violated section 10(b) of the Exchange Act by making various material misrepresentations and omissions in its financial disclosures issued during the class period. Due to the multiplicity and repetitiveness of the individual statements alleged to be actionable in the CAC, we categorize them topically as follows.

**1. Alleged Misrepresentation of the Adequacy of Student Loan Corp.'s Loan Loss Reserves**

Building upon their claim that Student Loan Corp. failed to sufficiently reserve for probable loan losses, plaintiffs allege that the company materially misrepresented the adequacy of those reserves in its Forms 10-Q. For example, plaintiffs contend that quarterly statements indicating the company had "increased its allowance for loan loss reserves," while technically true, were misleading given the concurrent reduction in its reserve ratio. (CAC ¶¶ 92-93, 134; see also Kasner Decl. Ex. D, at 34, 39.)

In addition, plaintiffs claim that Student Loan Corp. misrepresented its adherence to its own publicly-disclosed methodology for calculating estimated loan losses. (CAC ¶¶ 128, 138, 145, 158; see, e.g., Kasner Decl. Ex. D, at 7; id. Ex. E,

at 64.)  As an example, plaintiffs contend that Student Loan Corp. could not have genuinely considered current and expected market conditions as it said it did, or else it would have at least maintained, if not increased, its reserve ratio for uninsured private loans during the class period.  (CAC ¶¶ 127, 130.i, ii.)

### 2. Alleged Misrepresentation of Risk Attendant to Private Loan Portfolio

#### i. Acquisition of Private CitiAssist Loans from CBNA

Another group of allegations focuses on statements made regarding the risk exposure of Student Loan Corp.'s private loan portfolio during the class period.  In primary support of that claim, plaintiffs point to quarterly press releases issued in coordination with Student Loan Corp.'s Forms 10-Q which described "new CitiAssist loan commitments," but excluded the amount of CitiAssist loans purchased from CBNA during those periods.  (Id. ¶¶ 55-57; see Kasner Decl. Ex. C, at 5; id. Ex. G, at 5. )  As an example, plaintiffs submit that the October 15, 2009 press release which stated that Student Loan Corp. had "made new CitiAssist loan commitments of $0.3 billion" in the third quarter of 2009 was "grossly misleading" for failing to disclose that the company had purchased approximately $1.5

billion of CitiAssist loans from CBNA during that quarter. (CAC ¶¶ 55-56.)

Secondarily, while acknowledging that Student Loan Corp. actually disclosed the amount of CBNA-originated CitiAssist loans purchased each quarter in its Forms 10-Q, (see CAC ¶¶ 56-57), plaintiffs allege that the quantitative format of such disclosure insufficiently warned investors about the size and risk exposure of the company's private loan portfolio and compounded the misleading nature of the aforementioned press releases by "burying the loans obtained from CBNA in a sea of figures in charts." (Id. ¶ 58.)

### ii. Origination Strategy for Private Loan Portfolio

Plaintiffs further challenge various statements describing Student Loan Corp.'s efforts to improve its private loan origination strategy. For instance, they allege that statements indicating the company had "tightened" its underwriting standards and "refined" its loan origination strategy in an effort to reduce new CitiAssist loan commitments were misleading, given the concurrent acquisition of uninsured CitiAssist loans from CBNA, the amount and quality of which they submit negated any purported tightening or refining. (Id. ¶¶ 5, 55, 62, 67, 117, 125-126.) Thus, according to plaintiffs, such statements were false and misleading for omitting to state that

the company had materially increased its risk exposure by acquiring loans from CBNA. (Id. 130.vi, 139.vi, 149.vi.)

Plaintiffs allege that Reardon's individual statements about "repositioning efforts" with respect to private loan products were misleading for the same reason. (Id. ¶ 148 (quoting Reardon, remarking on first quarter 2010 results, as saying he "believe[s] the repositioning efforts we have taken, including reducing our expense base, modifying pricing on our private education loan product, securing a new funding arrangement and continuing to use the capital markets for funding, have put us in a strong position"); see id. ¶¶ 159, 164.)

### 3. Misrepresentation of Risk Attendant to Federal Loan Portfolio

The final series of claims allege material omissions with respect to defendants' disclosure of bad or uncollectible federal loans. Specifically, plaintiffs contend that Student Loan Corp.'s third quarter 2009, first quarter 2010 and second quarter 2010 Forms 10-Q omitted certain information, required by GAAP, about the company's non-accrual and past due federal loans. (CAC ¶ 107); see ASC 310-10-50-7 (requiring disclosures related to non-accrual and past due financing receivables as of each balance sheet date, except for loans acquired with deteriorated credit quality). Plaintiffs argue that the failure

to disclose such information on a quarterly basis permitted Student Loan Corp. to effectively avoid disclosing certain delinquency trends in its federal loan portfolio, thereby lowering the portion of its federal loans that it estimated to be uncollectible.  (CAC ¶ 107.)

### E. Student Loan Corp.'s Subsequent Disclosure of the Full Extent of its Losses

#### 1. April 2010 Disclosure

Plaintiffs point to a series of disclosures that they allege revealed the truth about Student Loan Corp.'s financial condition to the marketplace.  First, they claim the company partially disclosed the fraud in an April 19, 2010 press release, which stated that its "allowance for loan losses at March 31, 2010 was $173.2 million, an increase of $24.1 million compared to $149.1 million at December 31, 2009.  This increase reflects continued performance deterioration from the economic environment, seasoning of the uninsured CitiAssist Standard portfolio, $6.3 million of additional reserves for newly consolidated securitization loan assets and $5.1 million associated with private education loan forbearance policy changes.  These policy changes will result in the Company limiting its borrower assistance programs and are expected to materially increase credit losses beginning in the fourth quarter of 2010."  (CAC ¶ 151.)  The same day, the company's

stock price closed at $31.59, a $2.62 decline from its closing price of $34.21 on the previous trading day.  (Id. ¶ 162.) Thus, as framed by plaintiffs, the April 19 press release constituted an admission that, prior to the first quarter of 2010, Student Loan Corp.'s loss reserves were insufficient to meet its foreseeable credit losses.[4]  (Id.)

### 2. The Discover Transactions and the Third Quarter 2010 Impairment Charge

However, plaintiffs submit that the alleged fraud was not fully revealed until September 2010, when Student Loan Corp. disclosed a pre-tax impairment charge on certain of its loan assets held for sale.  On September 17, 2010, the company announced that it would merge with a subsidiary of Discover in a transaction to be consummated by the end of 2010, immediately after it sold approximately $36 billion of loans to CBNA and Sallie Mae (collectively, the "Discover transactions").  (Id. ¶ 72; Def. Mem. at 1.)  The press release disclosed the following proposed structure of the Discover transactions, each of which was cross-conditioned on the closing of the others:  Student Loan Corp. would sell to CBNA certain of its federal and private student loans and related assets, totaling $8.7 billion.  It

---

[4] We note that Student Loan Corp.'s common stock had been steadily declining during the class period, from $52.07 per share on November 25, 2009 to $34.21 on April 16, 2010.  Moreover, the company's stock price had dropped more than $2.62 in a single day on at least two other occasions during the class period: October 30, 2009 and December 18, 2009.

would also sell $28 billion of securitized federal student loans and related assets to Sallie Mae.  Once those sales were complete, Discover and its acquisition subsidiary would acquire Student Loan Corp.'s remaining assets, including the remainder of its private loan portfolio and $4 billion in federal loans, for the proposed merger price of $30 per share.  (CAC ¶¶ 72, 163; Kasner Decl. Ex. M, ¶ 32.)  Trading in the company's common stock closed at $29.87 on September 17, a $8.72 per share increase from the previous trading day.

On September 23, 2010, Student Loan Corp. issued a Form 8-K containing the Merger Agreement with Discover.  (CAC ¶ 165; Kasner Decl. Ex. J.)  As part of that Agreement, Student Loan Corp. announced that it had transferred loans to be sold to CBNA and Sallie Mae into the "held for sale" category, which GAAP requires to be recorded at the lower of cost or fair value. (CAC ¶ 166.)  Having determined the value of those loans to be impaired, the company disclosed that it expected to record a pre-tax impairment charge of approximately $0.8 billion to $1 billion in the third quarter of 2010 in order to reduce the carrying value of the loans to the lower of cost or fair value (the "impairment charge").  (Id. ¶ 166.)  Plaintiffs contend that this was the first disclosure that those loans were worth less than their carrying value.  (Id. ¶¶ 165-166.)  Although the

19

company's stock closed at $29.76 on September 23, plaintiffs allege that, but for the announcement of the Discover merger, that price would have dropped as a result of the impairment charge. (<u>Id.</u> ¶ 198; Pl. Opp. at 35.)

In its Form 10-Q for the third quarter of 2010, Student Loan Corp. disclosed that the pre-tax impairment charge on the loans held for sale to CBNA and Sallie Mae was determined to be $900.8 million. (CAC ¶¶ 72-74, 167.) As characterized by plaintiffs, the impairment charge revealed previously hidden credit losses that should have been, but were not, either taken into account in the loan loss allowances for previous quarters during the class period or recognized by an increase to the allowance before those loans were transferred into the "held for sale" category. (<u>Id.</u> ¶¶ 74, 114-115.)

**F. The Delaware Chancery Court Action and Settlement Order**

On September 20, 2010, three days after the initial announcement of the Discover transactions, Student Loan Corp. shareholders filed a class action in the Delaware Court of Chancery seeking to enjoin the merger (the "Delaware action"). <u>See</u> Amended Complaint, <u>In re Student Loan Corp. Litig.</u>, No. 5832-VCL (Del. Ch. Ct. Oct. 18, 2010), Kasner Decl. Ex. M. Plaintiffs Alan R. Kahn and Electrical Workers Pension Fund, Local 103, I.B.E.W. (the "Delaware plaintiffs"), who were

represented by counsel for plaintiffs in this action, brought suit behalf of a proposed class of all record holders and beneficial owners of Student Loan Corp. common stock who held such shares between September 17, 2010 and December 31, 2010. (Kasner Decl. Ex. L, at 2; id. Ex. M, at 1.)  Primarily, the Delaware plaintiffs alleged that Student Loan Corp. had deliberately undervalued the company's loan assets in an attempt to sell them "as quickly as practicable," resulting in a "fire-sale price" for its assets in breach of its directors' fiduciary duty.  (Kasner Decl. Ex. M, ¶¶ 34-42.)  They also claimed that Student Loan Corp. made incomplete and misleading disclosures regarding the proposed Discover transactions.  (Id. ¶¶ 81-86.)

Following a settlement hearing held on October 27, 2011, Vice Chancellor J. Travis Laster entered a final settlement order in the Delaware action.  See Order and Final Judgment, In re Student Loan Corp. Litig., No. 5832-VCL (Del. Ch. Ct. Oct. 27, 2011), Kasner Decl. Ex. O (the "Settlement Order").  Under the Settlement Order, which certified the non-opt out class described above, Delaware class members were awarded $32.50 per share, a $2.50 share recovery above the merger price.  (Kasner Decl. Ex. N, at 5.)  Both named plaintiffs in this action were members of the Delaware class and recovered under the Settlement Order.

Notably, the Settlement Order also contained a broad release of all past, present, and future possible claims that could arise in relation to those settled in the Delaware action. Specifically, the release required all class members to waive "any claims, matured or unmatured, . . . that have been, could have been, or in the future can or might be asserted in any court . . . including . . . any claims arising under federal . . . law, including the federal securities laws . . . against [Student Loan Corp.] . . . Discover Bank . . . Citi or any of their . . . affiliates or . . . respective past or present officers, directors . . . which have arisen, could have arisen, arise now or hereafter may arise out of or relate in any matter to the acts, events, facts, matters, transactions, occurrences, statements, representations, misrepresentations or omissions or any other matter whatsoever . . . related, directly or indirectly, to the allegations in the Actions, the . . . Merger Agreement . . . or disclosures made in connection therewith (including the adequacy and completeness of such disclosures)." (Kasner Decl. Ex. O, at 2-3.)

## II.  Procedural Background

The initial complaint in this action was filed on February 3, 2012.  (Dkt. No. 1.)  Thereafter, notice of the lawsuit was published to all putative class members in accordance with 15

U.S.C. § 78u-4(a)(3)(A)(i).   On April 11, 2013, this Court
granted plaintiffs' joint motion to be appointed as lead
plaintiffs and approved the selection of Grant & Eisenhofer,
P.A. and Gardy & Notis, LLP as co-lead counsel pursuant to the
Private Securities Litigation Reform Act (the "PSLRA").   (Dkt.
No. 13); see 15 U.S.C. § 78u-4(a)(3)(B)(i).

On June 22, 2012, plaintiffs filed the CAC.   On September
7, 2012, defendants filed their motion to dismiss the CAC and
memorandum in support, which plaintiffs opposed on October 16,
2012.  Defendants replied on November 12, 2012.  The Court heard
oral argument on the pending motion to dismiss on April 30, 2013
("oral argument").[5]

DISCUSSION

### I. Pleading Standards

### A.  Motion to Dismiss

On a motion to dismiss under Rule 12(b)(6), the Court must
accept as true all factual allegations in the complaint and draw
all reasonable inferences in a plaintiff's favor.   See ATSI
Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir.
2007).   Nevertheless, a plaintiff's factual allegations "must be
enough to raise a right of relief above the speculative level,
on the assumption that all of the allegations in the complaint

---

[5] References preceded by "Tr." refer to the transcript of oral argument.

are true." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (internal citation omitted).   Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." <u>Id.</u> at 570.   If they have not "nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." <u>Id.</u>; <u>see</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 684 (2009) (concluding that <u>Twombly</u> pleading standard applies in "all civil actions").

### B. Securities Fraud Claims Under Section 10(b) of the Exchange Act

In order to sustain a private cause of action for securities fraud under section 10(b) and Rule 10b-5 of the Exchange Act, a plaintiff must adequately plead the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." <u>Ashland Inc. v. Morgan Stanley & Co.</u>, 652 F.3d 333, 337 (2d Cir. 2011) (quoting <u>Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.</u>, 552 U.S. 148, 157 (2008)).

Claims brought under section 10(b) are "subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." <u>ATSI Commc'ns</u>, 493 F.3d at 99.

Those requirements are set forth in Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA, 15 U.S.C. § 78u-4(b). See ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co. ("ECA"), 553 F.3d 187, 196 (2d Cir. 2009).

### 1. Rule 9(b)

Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); see also ATSI Commc'ns, 493 F.3d at 99. In order to satisfy that burden, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speakers, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (internal quotation marks omitted). "Allegations that are conclusory or unsupported by factual assertions are insufficient." ATSI Commc'ns, 493 F.3d at 99.

### 2. The PSLRA

With respect to securities fraud allegations, the PSLRA has expanded on Rule 9(b)'s heightened pleading requirements. See 15 U.S.C. § 78u-4(b). The statute requires that "securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity

25

facts giving rise to a strong inference that the defendant acted with the required state of mind.'"   <u>Dura Pharms., Inc. v. Broudo</u>, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. § 78u-4(b)(1), (2)).   "Therefore, 'while we normally draw reasonable inferences in the non-movant's favor on a motion to dismiss,' the PSLRA 'establishes a more stringent rule for inferences involving scienter' because the PSLRA requires particular allegations giving rise to a strong inference of scienter." <u>ECA</u>, 553 F.3d at 196 (quoting <u>Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.</u>, 531 F.3d 190, 194 (2d Cir. 2008)).

## II. Analysis

In their motion to dismiss the CAC, defendants first contend that plaintiffs released their claims under the Delaware Settlement Order.   Alternatively, they argue that plaintiffs fail to sufficiently plead actionable misrepresentations or omissions, scienter, and loss causation.   (<u>See</u> Def. Mem. at 4-5.)   We address each of those arguments in turn.

### A. Impact of the Settlement Order in the Delaware Action

Each named plaintiff in this action was a member of the non-opt out Delaware class and recovered $2.50 per share in addition to the $30 merger price under the Settlement Order entered therein.   <u>See</u> Tr. at 3:16-17, 3:22-4:1.   As such, they

released all existing and potential securities fraud claims that arise in any way from disclosures made in connection with the Discover transactions.  (<u>See</u> Settlement Order, Kasner Decl. Ex. O, at 4-5 (releasing claims that "arise out of or relate in any manner to the . . . DFS Merger Agreement, the SLM Transaction Agreement, the CBNA Transaction Agreement, the transactions contemplated therein (the Proposed Transactions), or disclosures made in connection therewith (including the adequacy and completeness of such disclosures)").

Plaintiffs maintain that their claims are not barred by the terms of the release because they allege securities fraud in connection with other disclosures regarding the company's business "general[ly]," made during "an entirely different period of time." Tr. at 3:3-4.  We find that argument unpersuasive.  All parties agree that the impairment charge was taken as a direct result of, and disclosed in connection with, the Discover transactions.  (<u>See</u> Kasner Decl. Ex. J, at 2 ("As a result of the [Merger] Agreements . . ., the Company has transferred loans to be sold to CBNA and Sallie Mae into loans held for sale, which are required to be recorded at the lower of cost or fair value.  The company determined the fair value of these loans and, on September 17, 2010, concluded that certain of these student loan portfolios have become impaired.  Based on

27

the terms of the Agreements, the Company expects to record a pre-tax impairment charge in the third quarter of 2010 of approximately $0.8 to $1.0 billion to reduce the carrying value of these portfolios to the lower of cost or fair value."); see also CAC ¶ 165 (alleging that Student Loan Corp. took the impairment charge "[a]s part of the Merger Agreement").) It is central to plaintiffs' claims that the disclosure of the impairment charge was the full disclosure of the alleged fraud, in that it revealed the insufficiency of Student Loan Corp.'s loan loss reserve levels and rendered false and misleading prior statements the company had made about its financial condition. (See, e.g., CAC ¶¶ 115-116, 165-167.) Thus, to the extent they rely on the impairment charge as a corrective disclosure, plaintiffs' claims fall squarely within the broad scope of the release and they lack standing to bring the instant lawsuit.[6]

---

[6] Gardy & Notis, co-lead counsel in this action, was also class counsel in the Delaware action for a certified, non-opt out class of which plaintiffs here were members. (See Kasner Decl. Ex. M, at 30.) In Delaware, Gardy & Notis maintained that Student Loan Corp. deliberately devalued its assets in order to ensure a sale of the company, but here it relies on the precise opposite proposition, namely, that defendants deliberately inflated Student Loan Corp.'s stock price by hiding financial information in order to secure the same sale. Not only has the firm asserted polar opposite positions in different tribunals, but having settled the Delaware action and released all potential related claims, Gardy & Notis now maintains their clients should recover an additional award beyond the $2.50 per share premium it touted as "an excellent result" before Vice Chancellor Laster. (Def. Mem. at 12; Kasner Decl. Ex. N, at 14-15.) We inquired during oral argument how Gardy & Notis could take such clearly inconsistent positions in Delaware and here, but did not receive an adequate or meaningful response, perhaps because the firm sent a representative who had been deliberately screened from the Delaware case. See Tr. at 57:15-61:11. However, were this case to survive beyond the motion to dismiss stage, we would seriously question the Gardy &

28

See <u>Corines v. Charter One Bank</u>, 365 Fed. App'x 237, 239 (2d Cir. 2010) (affirming district court's dismissal for lack of standing where plaintiffs' claims were encompassed within the terms of a release).

At oral argument, plaintiffs attempted to circumvent the standing issue by arguing that they represent a purported class of similarly situated purchasers of Student Loan Corp. common stock, at least some of whom arguably did not release their claims in the Delaware action.  <u>See</u> Tr. at 3:6-10.  However, that argument ignores the distinction between a <u>lead</u> plaintiff appointed to represent a purported class and a <u>named</u> plaintiff

---

Notis firm's ability to fairly and adequately represent the interests of the putative class.  <u>See</u> Fed. R. Civ. P. 23(g)(4).  Further, although the issue has not been briefed, we believe a serious argument could be advanced that counsel's inconsistent position in this action raises issues of judicial estoppel.  <u>See</u> <u>DeRosa v. Nat'l Envelope Corp.</u>, 595 F.3d 99, 103 (2d Cir. 2010) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." (citing <u>New Hampshire v. Maine</u>, 532 U.S. 742, 749 (2001))).  Typically, judicial estoppel applies if "1) a party's later position is clearly inconsistent with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel."  <u>Id.</u> (internal quotation marks omitted).  While our research has not revealed the application of the doctrine of judicial estoppel where the earlier action was resolved by judicially-approved settlement award, it would appear that the criteria for the doctrine's application are met in this case.  Moreover, Gardy & Notis's inconsistent representations to the Delaware Chancery Court and this Court implicate the Second Circuit's particular concern about the impact of potentially inconsistent results on judicial integrity.  <u>See</u> <u>In re Adelphia Recovery Trust</u>, 634 F.3d 678, 695-96 (2d Cir. 2011) (noting that the Second Circuit requires a risk of inconsistent results "with its impact on judicial integrity" as an additional criterion when applying the judicial estoppel doctrine).

who must establish standing.   While lead plaintiffs appointed pursuant to the PSLRA need not satisfy all the elements of standing with respect to the entire lawsuit in order to defeat a motion to dismiss, at least one named plaintiff must have standing to pursue each claim alleged.   See, e.g., In re Smith Barney Transfer Agent Litig., 765 F. Supp. 2d 391, 400 (S.D.N.Y. 2011); In re Salomon Analyst Level 3 Litig., 350 F. Supp. 2d 477, 496 (S.D.N.Y. 2004); In re Global Crossing Sec. Litig., 313 F. Supp. 2d 189, 205 (S.D.N.Y. 2003).   If no named plaintiff has standing to represent the potential class of plaintiffs who have suffered the alleged injury giving rise to the action, courts typically dismiss the action in its entirety.   See Smith Barney, 765 F. Supp. at 403.   Wholly apart from the standing issue, for the reasons that follow, we find that none of plaintiffs' claims states an actionable claim for relief.   Nevertheless, were we to conclude otherwise, it would be inappropriate to allow the instant lawsuit to proceed simply on the assumption that some putative class members are not subject to the Delaware release.[7]

---

[7] In any event, having concluded that members of the Delaware class are precluded from bringing the instant claims, there remain far fewer eligible class members than plaintiffs would have us believe.   Only purchasers who bought Student Loan Corp. common stock before the alleged fraud was supposedly partially disclosed on April 19, 2010, while plaintiffs claim the stock price was still artificially high, but who were no longer holding their shares as of the September 23, 2010 inception of the Delaware class, when the release became effective, would have standing to bring the securities fraud claims asserted here.

### B. Adequacy of Loan Loss Reserves

As described earlier, plaintiffs contend that the CAC adequately alleges defendants' failure to record sufficient loan loss reserves, despite objective evidence of the deteriorating performance of its loan portfolios, in violation of GAAP and the company's own publicly-disclosed methodology.[8]  (Pl. Opp. at 9.) They further claim that the 2010 impairment charge constituted an admission that loss reserves recorded in previous quarters were inadequate.  (Id. at 17-19.)  In their motion to dismiss, defendants argue that plaintiffs' claims are nothing more than broad assertions devoid of any particularized facts suggesting that Student Loan Corp. fraudulently failed to reserve for its anticipated losses.  (Def. Mem. at 2-3, 16-24.)

While financial disclosures not prepared in conformity with GAAP are presumed to be misleading under SEC Regulation S-X, see 17 C.F.R. § 210.4-01(a)(1), and thus may give rise to a section 10(b) claim, mere allegations of GAAP violations are insufficient to state a securities fraud claim.  See Novak v.

---

[8] Typically, plaintiffs alleging a company's failure to comply with GAAP bring claims against the accounting firms who prepare, review, or audit the defendant company's financial disclosures.  See, e.g., Fait v. Regions Fin. Corp., et al., 655 F.3d 105 (2d Cir. 2011) (naming Ernst & Young, LLP as defendant); Penn. Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp., et al., 874 F. Supp. 2d 341, 347 (S.D.N.Y. 2012) (naming PricewaterhouseCoopers, LLP as defendant).  We find it curious that plaintiffs have failed to do so here.  Moreover, when asked about this at oral argument, plaintiffs' counsel offered no good explanation other than the general difficulty of pleading scienter against accountants when bringing a securities fraud claim.  See Tr. at 19:14-20:3.

Kasaks, 216 F.3d 300, 309 (2d Cir. 2000); In re CitiGroup Inc.
Bond Litig. ("CitiGroup"), 723 F. Supp. 2d 568, 592 (S.D.N.Y.
2010).  Only where such allegations are coupled with evidence of
"corresponding fraudulent intent" will they be sufficient to
state an actionable claim.  Chill v. General Elec. Co., 101 F.3d
263, 270 (2d Cir. 1996); see Novak, 216 F.3d at 309; Stevelman
v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999).

     Moreover, and of particular relevance here, recent Second
Circuit case law has established that estimates of loan loss
reserves are generally considered opinions, not objective facts,
and thus a section 10(b) claimant must plead in detail that such
"opinions were both false and not honestly believed when made."
Fait v. Regions Fin. Corp., et al., 655 F.3d 105, 113 (2d Cir.
2011); see City of Omaha, Neb. Civilian Employees' Ret. Sys. v.
CBS Corp., 679 F.3d 64, 67-68 (2d Cir. 2012) (applying reasoning
of Fait, which affirmed dismissal of section 11 and 12(a)
claims, to section 10(b) claims).

     Applying those standards here, we conclude that plaintiffs
have failed to state an actionable securities fraud claim with
respect to the alleged GAAP violations.  The CAC contains no
allegations whatsoever contradicting the reasonableness of the
estimated quarterly loss reserves at the time they were made.
Rather, it merely speculates that those reserves could not have

been adequate when made, given that loan loss allowances decreased as a percentage of total loan assets over the course of the class period. However, as plaintiffs conceded at oral argument, "it is nowhere written" that a company must maintain a specific reserve ratio or increase that ratio in response to expected credit deterioration and other negative economic circumstances.[9]  Tr. at 8:25-9:4.  Plaintiffs simply draw their own conclusions about the inadequacy of Student Loan Corp.'s loan loss reserves in light of the size of its loan portfolios,[10] a particularly unpersuasive approach considering that GAAP requires lenders to record loss reserves based only on loans it deems probable to be uncollectible, and not on its entire loan portfolio.  See ASC 310-10-35-4(a).

Plaintiffs' analogy to Sallie Mae's reserve ratio during the class period is no more successful.  See In re PXRE Grp. Ltd. Sec. Litig., 600 F. Supp. 2d 510, 540-41 (S.D.N.Y. 2009)

---

[9] Plaintiffs rely on a 2006 policy statement issued by the Office of the Comptroller of the Currency, which they contend encourages the use of a reserve ratio analysis in determining the adequacy of loan loss reserves. CAC ¶¶ 63-64, 91-92 (citing Policy Statement, Office of the Comptroller of the Currency, et al., *Interagency Policy Statement on the Allowance for Loan and Lease Losses*, at 12 n.23 (Dec. 13, 2006) ("OCC Policy Statement")). Leaving aside plaintiffs' failure to establish that an OCC pronouncement is an authoritative interpretation of GAAP, we note that defendants rely on the same policy statement, indeed the same footnote, for the exact opposite proposition, namely, that it is inappropriate to use any standard percentage as the sole determinant for reporting loan loss allowance. See Def. Mem. at 18 n.7 (citing OCC Policy Statement, at 12 n.23).

[10] Indeed, plaintiffs conceded at oral argument that statements in Student Loan Corp.'s Forms 10-Q indicating that the company had increased the dollar amount of its loan loss provisions during each quarter of the class period were "technically true."  Tr. at 68:11-16.

(concluding that comparison of peer companies' loss estimates was insufficient to support 10(b) claim because plaintiffs "fail[ed] to provide any information about the identities of each competitor's cedents, the levels of risk they assumed, the speed at which each company received information from its cedents or any of the myriad other factors that might distinguish them").

We further reject the logic underlying plaintiffs' assertion that the 2010 impairment charge revealed previously hidden losses that should have been earlier recorded as loss provisions, and therefore evidences Student Loan Corp.'s failure to adequately reserve in violation of GAAP. Even if plaintiffs offered factual information to support an inference that credit losses as of September 2010 were incurred during earlier reporting periods, which they do not, there remains a critical distinction between the determination required to estimate losses that have been incurred on loans held for investment and the determination of the impairment of loans held for sale. As discussed above, when a lender holds loans for investment, or until maturity or for the foreseeable future, GAAP requires only that it estimate losses probable to <u>have already been incurred</u> on those loans. ASC 310-10-35-47. By contrast, lenders must record loans held for sale at the lower of cost or fair value,

which requires them to ascertain existing credit losses as well as losses expected over the future life of the loans. ASC 310-10-35-49. Thus, plaintiffs compare apples to oranges when they argue that the write-down taken on loans held for sale to Sallie Mae and CBNA in third quarter 2010 should have been recorded earlier as loss provisions when those loans were still held for investment. The two determinations require wholly different accounting judgments and calculations.[11]

Even assuming arguendo that the CAC sufficiently alleged defendants' violation of GAAP, plaintiffs do not meet the heightened burden for pleading securities fraud with respect to loan loss reserves. Try as they may to distinguish Fait, plaintiffs allege no basis for concluding that Student Loan Corp.'s loan loss reserves reflected anything other than management's opinion – based on a variety of subjective determinations – as to the likelihood and magnitude of future losses. ASC 310-10-35-4(b); see Fait, 655 F.3d at 113 ("[D]etermining the adequacy of loan loss reserves is not a matter of objective fact [because] . . . [such] reserves reflect management's opinion or judgment about what, if any, portion of

---

[11] Putting aside these differing GAAP standards, plaintiffs do not persuade us that the impairment charge revealed loan losses which were previously "hidden" from investors. Indeed, in its Form 10-Q for the first quarter of 2010, Student Loan Corp. disclosed that the carrying value of its private loan assets was approximately $2.78 billion higher than their fair value, an amount far in excess of the eventual write-down in third quarter 2010. (See Kasner Decl. Ex. H, at 21.)

amounts due on the loans ultimately might not be collectible.")
NECA-IBEW Pension Trust Fund v. Bank of Am. Corp. ("NECA-IBEW"),
No. 10 Civ. 440 (LAK) (HPB), 2012 WL 3191860, at *12 n.19
(S.D.N.Y. Feb. 9, 2012); see also Tr. at 67:4-10 (conceding
subjectivity of estimation analysis). Moreover, each of Student
Loan Corp.'s Forms 10-Q clearly stated that its loss reserves
were estimated figures subject to market conditions and were by
no means guarantees of the loss amounts likely to be incurred.
See, e.g., Kasner Decl. Ex. D, at 35 ("No assurance can be
provided that the allowance for loan losses will be adequate to
cover all losses that may in fact be realized in the future, or
that a higher level of provision for loan losses will not be
required."); cf. Fait, 655 F.3d at 110-11 & n.3, 112, 113 & n.6
(noting that there may be liability if an opinion is framed as a
guarantee). Absent allegations that defendants either estimated
loan losses using an objective standard or guaranteed those
estimates, of which there are none in the CAC, plaintiffs fail
to remove this case from the purview of Fait. See In re CIT
Grp. Inc. Sec. Litig., 349 F. Supp. 2d 685, 689-90 (S.D.N.Y.
2004).

Having concluded that Fait applies to this case, we find
that plaintiffs allege no facts whatsoever to support their
argument that defendants did not honestly believe their loan

loss reserves were adequate when made.  The CAC identifies no internal reports possessed by defendants, communications among Student Loan Corp. employees, or firsthand accounts from confidential witnesses from which one could reasonably conclude that defendants manipulated or did not actually perform the multi-factor migration analysis they said they did.  Plaintiffs point vaguely to publicly available Department of Education cohort default rates, which they argue should have informed defendants of the increased risk to which the private loan portfolio was exposed.  CAC ¶¶ 174-177.  However, "flags are not red merely because the plaintiff calls them red."  Stephenson v. PriceWaterhouseCoopers, LLP, 768 F. Supp. 2d 562, 574-75 (S.D.N.Y. 2011).  Leaving aside the logical leap required to find historical federal loan default rates authoritative when estimating probable losses on private loans, a complaint must allege more than the mere existence of contradictory information to support a securities fraud claim; it must allege particularized facts that suggest that the defendants knew of and disregarded such information.  See City of Omaha, 679 F.3d at 68 ("[E]ven if the . . . complaint did plausibly plead that defendants were aware of facts that *should* have led them to begin interim impairment testing earlier, such pleading alone would not suffice to state a securities fraud claim after

*Fait.*"); <u>In re Tremont Sec. Law, State Law and Ins. Litig.</u>, 703 F. Supp. 2d 362, 370 (S.D.N.Y. 2010); <u>In re PXRE Grp.</u> 600 F. Supp. 2d at 538-39, 547-48.

Thus, at best, plaintiffs' theory is one of underestimation in hindsight. It relies on conclusory allegations to mask the legally insufficient contention at its core, which is that defendants could not possibly have believed their own estimates, since plaintiffs interpret those estimates to have proven inadequate. See <u>NECA-IBEW</u>, 2012 WL 3191860, at *10, 12 n.19 ("[T]he mere fact that [defendant's] predicted loss reserves turned out to be insufficient some time after they were made does not render those figures false at the time they were publicly filed with the SEC."); see also <u>In re Fannie Mae 2008 Sec. Litig.</u>, No. 12-3859, 2013 WL 1982534, at *1-2 (2d Cir. May 15, 2013); <u>Caiafa v. Sea Containers Ltd.</u>, 331 F. App'x 14, 16 (2d Cir. 2009); <u>Chill v. Gen Elec. Co.</u>, 101 F.3d 263, 270 (2d Cir. 1996); <u>Alaska Laborer Emp'rs Ret. Fund v. Scholastic Corp.</u>, 2010 WL 3910211, at *8 (S.D.N.Y. Sept. 30, 2010). As a result, we conclude that plaintiffs fail to state an actionable section 10(b) claim with regard to their loan loss allowance allegations.[12]

---

[12] Because we dismiss these claims for the foregoing reasons, we need not address defendants' argument that Student Loan Corp.'s loan loss allowances are protected by the PSLRA's safe harbor for forward-looking statements and

### C. Plaintiffs Fail to Plead an Actionable Misrepresentation or Omission Under Section 10(b)

Plaintiffs also maintain that defendants made material misstatements and omissions in several other respects. (Def. Mem. at 24.) We will address each of these areas seriatim, finding that defendants made sufficient disclosures to render their statements not misleading and, in any event, that plaintiffs have failed to raise a strong inference of defendants' scienter.

### i. Statements Concerning Student Loan Corp.'s Private Loan Portfolio

Plaintiffs allege that two sets of statements made by defendants regarding Student Loan Corp.'s private loan portfolio were misleading in light of the company's purchase of uninsured CitiAssist loans from CBNA during the class period. First, they claim that quarterly press releases stating the company had made "new private loan commitments" of certain amounts were

---

the judicially-created bespeaks caution doctrine. See Def. Mem. at 22-24. Nevertheless, we note that such arguments would likely be unavailing, as statements regarding loan loss reserves are generally not considered to describe expectations for a company's future, but are regarded instead as directed to its then-present financial condition. See In re SLM Corp., 740 F.2d 542, 555-56 (S.D.N.Y. 2010) ("[W]hile the statements regarding loan loss reserves necessarily include forward-looking projections about future defaults, '[s]tatements regarding loss reserves are not projections [if] they are directed to the then-present state of the Company's financial condition.'") (citing Schnall v. Annuity & Life Re (Holdings), Ltd., No. 02 Civ. 2133 (JFF), 2004 WL 367644, at *8 (D. Conn. Feb. 22, 2004) (internal citation omitted); see also In re Nortel Networks Corp. Sec. Litig., 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003) ("[I]t is well recognized that even when an allegedly false statement has both a forward looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply.").

misleading for failing to include the loans purchased from CBNA. (CAC ¶¶ 55-58, 131-33, 139.v, 141, 149.v.)  They further claim that statements indicating the company was making efforts to originate higher quality private loans were negated by the acquisition of loans from CBNA.  (Id. ¶¶ 125, 130.vi, 139.vi, 161.vi.)

While plaintiffs rely heavily on Student Loan Corp.'s acquisition of approximately $1.5 billion of CitiAssist loans from CBNA in the third quarter of 2009, (see id. ¶¶ 56, 125, 130.v, 130.vi, 139.v, 139.vi, 149.v, 149.vi.), their claims fail to distinguish between the transfer of loans from CBNA which Student Loan Corp. had earlier committed to purchase and new commitments to purchase loans.  As discussed earlier, the company was obligated to purchase a certain amount of CitiAssist loans from CBNA pursuant to the terms of the intercompany agreement.  (Id. ¶ 30.)  However, those CitiAssist loans were not carried on Student Loan Corp.'s books upon the commitment to purchase them, but rather were only acquired after CBNA had fully disbursed their proceeds to students and educational institutions.  (See Kasner Decl. Ex. E, at 18.)  Thus, plaintiffs deliberately ignore the mechanism by which Student Loan Corp. acquired CitiAssist loans when they argue that statements concerning "new private loan commitments" misled

investors by failing to mention the CitiAssist loans purchased from CBNA during those periods. (<u>See</u> Pl. Opp. at 24; Def. Mem. at 24.) The fact that CitiAssist loans came onto Student Loan Corp.'s books in a particular period does not render statements about <u>new</u> commitments during that period misleading, given the full and consistent disclosure of the elapsed time between the commitment to purchase the CitiAssist loans and the actual acquisition of those loans. These two events simply did not occur in the same time period.

The same logical flaw undermines plaintiffs' allegation that Student Loan Corp.'s acquisition of $1.5 billion in CitiAssist loans from CBNA negated any purported "tighten[ing]" or "refin[ing]" of the company's origination strategy. Under the intercompany agreement, the amount of CitiAssist loans purchased in a given quarter depended solely on the number of loans fully disbursed as of that period, and did not reflect Student Loan Corp.'s origination practices going forward, a conclusion reinforced by the company's declining commitment to purchase new CitiAssist loans over the course of the class period. (<u>See</u> Kasner Decl. Ex. K, at 20 (indicating new private loan commitments fell from $1.112 billion for the nine months ending September 30, 2009 to $593 million for the same period in 2010); <u>see also</u> Def. Mem. at 9-10 (noting same).) Thus, absent

a suggestion that the factual assertions contained in defendants' statements were false when made, of which the CAC is completely devoid, plaintiffs cannot attack those statements as misleading.  See <u>San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.</u>, 75 F.3d 801, 806, 812 & n.13 (2d Cir. 1996) (dismissing claim that statements of corporate optimism were materially misleading where plaintiffs failed to plead sufficient facts to support allegation that defendants were aware of facts rendering statements untrue or disbelieved at the time they were made).

Further, neither set of statements is actionable under section 10(b) in light of Student Loan Corp.'s extensive disclosures concerning the size, performance, and risk exposure of its private loan portfolio.  For example, quarterly press releases describing "new private loan commitments" were accompanied by consolidated balance sheets setting forth the principal balance of the company's private loans as of the relevant reporting date, as well as prior period comparisons. (<u>See, e.g.,</u> Kasner Decl. Ex. C, at 8; <u>id.</u> Ex. G, at 8.)  Each press release was closely followed by the filing of a Form 10-Q, which, as plaintiffs concede, expressly disclosed the amount of CitiAssist loans acquired from CBNA during that quarter.  (CAC ¶¶ 56, 58; <u>see</u> Kasner Decl. Ex. A, at 13; <u>id.</u> Ex. B, at 15; <u>id.</u>

42

Ex. D, at 16; id. Ex. E, at 98; id. Ex. H, at 16; id. Ex. I, at 16; id. Ex. K, at 20.)  As a matter of law, these disclosures defeat any argument that the press releases can serve as predicates for a claim of omission.  SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp., No. 09 Civ. 5064 (RMB), 2010 WL 2473595, at *8-9 (S.D.N.Y. June 17, 2010) (dismissing section 10(b) claim because "there can be no omission where the allegedly omitted facts are disclosed") (internal citation omitted); In re Progress Energy, Inc., 371 F. Supp. 2d 548, 552 (S.D.N.Y. 2005); see also Ganino v. Citizens Utilities Co., 228 F.3d 154, 167 (2d Cir. 2000) ("[A] misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market.").

Nor do we accept plaintiffs' argument that the above disclosures were insufficient to warn investors about the risk of default attendant to Student Loan Corp.'s private loans. (Pl. Opp. at 24.)  To the contrary, defendants disclosed precisely the type of information plaintiffs claim was withheld when it revealed that the fair value of the company's private loans was approximately $2.78 billion lower than their fair value, an amount far in excess of the eventual $900.8 million impairment charge.  (Kasner Decl. Ex. H, at 21.)  That disclosure not only informed investors about the financial

health of Student Loan Corp.'s private loan assets, but also
wholly negates plaintiffs' allegation that the impairment charge
constituted a corrective disclosure of previously hidden
information. (See CAC ¶ 74.)

Finally, we reject plaintiffs' astonishing allegation that
full disclosure of the amount of CitiAssist loans acquired from
CBNA, in easily readable charts in the Forms 10-Q, did not
"cure" the alleged incompleteness of the quarterly press
releases. (CAC ¶ 58; Pl. Opp. at 24.) Such a suggestion by
sophisticated institutional investors is at a minimum puzzling,
as it reveals either that they did not review the company's
financial disclosures, such that they were misled by narrative
press releases that no reasonable investor could expect would
replicate the amount or detail of the financial information
contained in a Form 10-Q, or that they did not understand the
information disclosed because it was "bur[ied] . . . in a sea of
figures in charts." (CAC ¶ 58.) To accept either proposition
would hardly be sensible, given that the quantitative
presentation of financial information in public SEC filings is a
preferable method of disclosing facts that are inherently
numerical in nature. But even if we accepted plaintiffs'
argument, the mere fact that information is disclosed in
quantitative rather than narrative format will not suffice to

state an actionable claim under section 10(b).  So long as the relevant information is accurately disclosed, as it was here, there is no requirement that it be presented in any particular way.  See SEC v. Siebel Sys., Inc., 384 F. Supp. 2d 694, 705 (S.D.N.Y. 2005) ("There is no requirement that a material fact be expressed in certain words or in a certain form of language.  Fair accuracy, not perfection, is the appropriate standard.") (internal citation omitted).

### ii. Statements Concerning Student Loan Corp.'s Federal Loan Portfolio

Plaintiffs' claim that defendants failed to disclose the risk exposure of its federal loan portfolio is difficult to comprehend, given that there can be no dispute that the following disclosures were made.  First, the specific items allegedly omitted from Student Loan Corp.'s Forms 10-Q, namely the amount of non-accrual and past due federal loans, were disclosed in the company's Form 10-K for 2009.  (CAC ¶ 107.) Plaintiffs provide us with no basis for concluding that annual, rather than quarterly, disclosure of such information somehow failed to inform investors about the true performance of Student Loan Corp.'s federal loan portfolio.

Further, each Form 10-Q issued during the class period stated the full amount of the company's charged-off federal loans, or defaulted federal loan amounts removed from its

balance sheet, thereby identifying the portion of its federal portfolio that had gone bad during those periods.  The Forms 10-Q also furnished year-over-year comparisons for those charge-offs, which allowed investors to evaluate the performance of the company's federal loan portfolio over time.  (See, e.g., Kasner Decl. Ex. H, at 32.)  More generally, they contained descriptions of ongoing negative trends in federal lending, such as the impact of SAFRA on results of operations and changes to fixed interest rates for FFEL loans.  (CAC ¶¶ 45-46; see Kasner Decl. Ex D, at 29.)  Plaintiffs fail to explain how, in light of these disclosures, investors were misled about the risk attendant to the company's federal loans during the class period.[13]  See In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 268 (2d Cir. 1993) (concluding that, in order to plead securities fraud under an omissions theory, plaintiffs must explain in detail why additional disclosures were necessary to "make [the] prior statements not misleading").

### iii. Scienter

Even if Student Loan Corp. had materially misrepresented the adequacy of its loan loss reserves and the risk exposure of

---

[13] Additionally, Student Loan Corp.'s Form 10-Q for the first quarter of 2010 clearly stated that the fair value of its federal loan portfolio was $403,363 less than its carrying value, information based on which a reasonable investor would be aware that federal loans were far from "risk-free."  (See Kasner Decl. Ex. H, at 21.)

its loan portfolios during the class period, plaintiffs would nevertheless fail to state a section 10(b) claim because they have not alleged sufficiently particularized facts giving rise to a strong inference of defendants' scienter.

"The requisite state of mind in a Section 10(b) and Rule 10b-5 action is an intent 'to deceive, manipulate, or defraud.'" ECA, 553 F.3d at 198 (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007)).  When assessing whether a plaintiff has adequately pled scienter, the Court must "take into account plausible opposing inferences," such that "[the] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 323-24.

The Second Circuit has recognized that plaintiffs may raise a compelling inference of scienter by alleging facts demonstrating either (a) "that defendants had the motive and opportunity to commit fraud," or (b) "strong circumstantial evidence of conscious misbehavior or recklessness."[14]  ECA, 553 F.3d at 198; see ATSI Commc'ns, 493 F.3d at 99.  Plaintiffs maintain that defendants were motivated to commit the alleged

---

[14] Although this dual standard predates the passage of the PSLRA, the Second Circuit has expressly noted that "both options for demonstrating scienter . . . survive the PSLRA." Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001).

fraud in order to maintain investment in its securitized loan products and to make Student Loan Corp. an attractive acquisition target.  They further argue that the individual defendants were incentivized to sell Student Loan Corp. because of the transaction-related compensation they received upon successful completion of the Discover merger.  (CAC ¶¶ 168-172, 184-187.)  Alternatively, they contend that the CAC alleges circumstantial evidence of defendants' conscious misbehavior or recklessness by identifying publicly available data contradicting their public disclosures, but which they failed to take into account in determining their loan loss reserves. (Id. ¶¶ 173-177; see Pl. Opp. at 27-28.)

Despite plaintiffs' conclusory allegations to the contrary, they fail to plead any individualized motive sufficient to withstand a motion to dismiss.  It is well established that general motives which can be attributed to all corporate employees will not suffice to raise a strong inference of scienter under the PSLRA.  See S. Cherry St., LLC, 573 F.3d at 109; Chill, 101 F.3d at 268.  Certainly, allegations that defendants were incentivized to artificially inflate the company's stock price in order to boost its net income or retain investments are too generalized to state a claim for securities fraud.  See San Leandro Emergency Med. Grp., 75 F.3d at 814

("[I]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.") (internal quotation marks omitted). Even the allegation that defendants were financially motivated to make the company's assets appear more attractive to a potential acquirer has been deemed attributable to all corporate executives.[15] See ECA, 553 F.3d at 201.

Plaintiffs' alternative allegation of conscious misbehavior or recklessness suffers from a failure to identify any contemporaneous data or information that defendants either possessed and disregarded, or failed to consider despite a duty to monitor. See ECA, 553 F.3d at 199 (internal quotation marks omitted). Vague references to publicly-available cohort default rates fail to specify how, if at all, those rates contradicted or revealed infirmities in defendants' loan loss estimation methodology, see Janbay v. Canadian Solar, Inc., No. 10 Civ. 4430 (RWS), 2012 WL 1080306, at *11 (S.D.N.Y. Mar. 30, 2012), let alone that defendants actually knew about such data so as to render their contrary assumptions improper. See Glaser v. The9,

---

[15] We find further support for our rejection of plaintiffs' motive argument in the Delaware complaint, brought by lead counsel in this action on behalf of a class that included plaintiffs here, which alleged that defendants deliberately deflated Student Loan Corp.'s assets to ensure a successful sale of the company. (See Kasner Decl. Ex. M, at 10-18.)

Ltd., 772 F. Supp. 2d 573, 595 (S.D.N.Y. 2011); Tyler v. Liz Claiborne, Inc., 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011); In re Aegon N.V. Sec. Litig., No. 03 Civ. 0603 (RWS), 2004 WL 1415973, at *17 (S.D.N.Y. June 23, 2004).[16]

Thus, plaintiffs have not established a cogent inference of defendants' scienter that is equally compelling to the opposing inference of non-fraudulent intent.  In light of the number, frequency, and level of detail of Student Loan Corp.'s negative disclosures during the class period, the more compelling inference is that defendants went to great lengths to make known the level of risk attendant to the company's loan portfolios, including increases to its net charge-offs, rising forbearance usage, delinquency and default rates, and anticipated adverse economic conditions expected to persist for an extended period of time.  (CAC ¶¶ 92, 95.)

Finally, because they fail to plead scienter with respect to the individual defendants, plaintiffs also fail to establish that Student Loan Corp. acted with corporate scienter.  See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital

---

[16] To the extent that plaintiffs argue that they need only plead facts suggesting defendants were "recklessly unaware" of publicly available data, (see Pl. Opp. at 27), they severely mischaracterize the authority on which they rely.  See In re Atlas Air Worldwide Holdings, Inc., 324 F. Supp. 2d 474, 495 (S.D.N.Y. 2004) (finding that a plaintiff is not required to plead defendants' possession of internal reports to demonstrate availability of contradictory facts only where plaintiff has sufficiently pled statements obtained from confidential sources with pertinent knowledge).

Inc., 531 F.3d 190, 195 (2d Cir. 2008) (holding that, in order to plead corporate scienter, a plaintiff must establish "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter").

### D. Loss Causation

While the foregoing discussion provides a more than sufficient basis to dismiss the CAC, we briefly address defendants' argument that plaintiffs have failed to adequately plead loss causation. (Def. Mem. at 36-38.)

Plaintiffs allege that defendants' false and misleading statements artificially inflated Student Loan Corp.'s stock price throughout the class period, thereby causing it to reach a period high of over $52 per share. (CAC ¶¶ 195-196.) Thus, they argue that members of the class suffered economic loss when the company's stock price fell from $34.21 to $31.59, a decrease of $2.62 per share, after their alleged "partial disclosure of the fraud" on April 19, 2010. (Id. ¶ 197.) They further contend that Student Loan Corp. revealed the full truth about its overstatement of its financial condition on September 23, 2010, and that but for its announcement of the Discover merger on September 17, 2010, the price of its stock would have fallen even further. (Id. ¶ 198.)

Plaintiffs focus on two dates to advance their loss causation allegations:  the first is April 19, 2010; the second is September 23, 2010, when the stock actually <u>rose</u> in response to Student Loan Corp.'s announcement of the Discover transactions.  Plaintiffs' argument fails for two reasons, discussed earlier.  As an initial matter, they simply have not established defendants' failure to disclose any information.  See <u>Lentell v. Merrill Lynch & Co., Inc.</u>, 396 F.3d 161, 173 (2d Cir. 2005) (noting that loss causation is properly alleged only when a "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security").

Second, plaintiffs' argument ignores the history of the company's stock price, which fell consistently throughout the class period.  A closer look at historical closing prices for Student Loan Corp. common stock reveals that the $2.62 decline attributed to the market's reaction to the April 19 press release was a rather typical occurrence within the general downward trend of Student Loan Corp.'s stock price prior to and during the class period.  In fact, the company's stock price had been steadily declining since November 2009, from approximately $52 on November 25, 2009 to approximately $34 on April 16, 2010, likely as a result of the overwhelmingly negative thrust of

defendants' disclosures throughout the class period. Even before that, the stock price had declined in excess of $2.62 at least twice before, on October 30, 2009 and December 18, 2009. The company's stock had traded even below $30 at various points in 2009, closing as low as $25.29 on March 5, 2009. Thus, the market had long absorbed the economic difficulties faced by the company. Cf. Leykin v. AT & T Corp., 423 F. Supp. 2d 229, 245 (S.D.N.Y. 2006) (holding that a decline in stock price following a public announcement of "bad news" does not, without more, demonstrate loss causation).

### E. Section 20(a) Claims

Section 20(a) of the Exchange Act provides for joint and several liability for "[e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78u-4(b)(2). It is a primary requirement of pleading a claim under section 20(a) that the plaintiff allege facts showing a primary violation by the controlled person. See ATSI Commc'ns, 493 F.3d at 108; Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998); Anwar v. Fairfield Greenwich, Ltd., 728 F. Supp. 2d 372, 413 (S.D.N.Y.

2010).   Thus, because the CAC fails to state a claim of a primary violation under section 10(b) or Rule 10b-5, plaintiffs' claims under section 20(a) must be dismissed as well.   See Slayton v. Am. Express Co., 604 F.3d 758, 778 (2d Cir. 2010).

**CONCLUSION**

For the aforementioned reasons, defendants' motion to dismiss the CAC is granted.   The Clerk of the Court is hereby directed to terminate the motion pending at docket number 21 and close this case.


**SO ORDERED.**


DATED:     New York, New York
           June 25, 2013


NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Order have been mailed on this date to the following:

**Attorneys for Plaintiffs**
Daniel L. Berger, Esq.
Jay W. Eisenhofer, Esq.
Grant & Eisenhofer P.A.
485 Lexington Ave., 29th Floor
New York, NY 10017

Jeffrey A. Almeida, Esq.
Grant & Eisenhofer P.A.
123 Justison Street
Wilmington, DE 19801

Mark C. Gardy, Esq.
Meagan A. Farmer, Esq.
Gardy & Notis, LLP
501 Fifth Avenue, Suite 1408
New York, NY 10017

**Attorneys for Defendants**
Jay B. Kasner, Esq.
Susan L. Saltzstein, Esq.
Alexander C. Drylewski, Esq.
Rachel Barnett, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square, 42nd Floor
New York, NY 10036